No. 23-3023

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

RUSSELL DEAN ALFORD,
*Defendant-Appellant.*

———————————

On Appeal from the United States District Court
for the District of Columbia
Case No. 1:21-cr-00263-TSC-1

———————————

# INITIAL BRIEF OF APPELLANT
# RUSSELL DEAN ALFORD

KEVIN L. BUTLER
Federal Public Defender
Northern District of Alabama

DEANNA LEE OSWALD
Assistant Federal Defender

TOBIE J. SMITH
Appellate Attorney
505 20th Street North
Suite 1425
Birmingham, Alabama 35203
205-208-7170

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. Rule 28(a)(1), Defendant-Appellant Russell Dean Alford hereby states as follows:

### A.     Parties and Amici:

The Defendant-Appellant is Russell Dean Alford. The Appellee is the United States of America. There are no intervenors or amici.

### B.     Rulings Under Review:

This is an appeal from the denial by the district court (the Honorable Tanya S. Chutkan), on October 4, 2022, of Mr. Alford's motion for judgment of acquittal after the close of the evidence (App. 1105–06) and that court's judgment, issued February 8, 2023, imposing sentence after a jury trial (App. 1358–64). In this appeal, Mr. Alford seeks review of his convictions and sentence.

### C.     Related Cases:

This case has not previously been before this Court. There are no related cases of which Defendant-Appellant is aware.

# STATEMENT REGARDING ORAL ARGUMENT

Mr. Alford requests oral argument because this case presents novel and important questions about the interpretation of two laws he was convicted under, 18 U.S.C. § 1752(a)(2) and 40 U.S.C § 5104(e)(2)(D), and whether his mere presence in the Capitol Building on January 6, 2021, was sufficient to constitute "disorderly or disruptive conduct" under those provisions. He also challenges the substantive reasonableness of his 12-month sentence. Both issues are fact-bound and meritorious, and oral argument would significantly aid the decisional process. *See* Fed. R. App. P. 34(a)(2).

# TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases ........................... c-1

Statement Regarding Oral Argument ...................................................... i

Table of Contents ................................................................................. ii

Table of Authorities ............................................................................ v

Statement of Jurisdiction .................................................................... xii

Introduction ......................................................................................... 1

Statement of the Issues ........................................................................ 2

Statutes and Regulations ...................................................................... 2

Statement of the Case .......................................................................... 6

    I.     Course of Proceedings and Dispositions in the Court Below ...... 6

    II.    Statement of the Facts ................................................................ 7

        A.    General Evidence about Events of January 6, 2021 .............. 7

        B.    Evidence about Mr. Alford's Actions ..................................... 9

            1.    Mr. Alford's path to the East Front of the Capitol kept him at a distance from the largest and unruliest crowds .............................................................. 9

            2.    Mr. Alford was inside the Capitol for about 13 minutes, during which he largely stood stationary and silent ......................................................................... 11

        C.    Motion for Judgment of Acquittal ........................................ 15

D.  Sentencing ........................................................................... 16

III.  Statement of the Standards of Review ..................................... 20

Summary of the Argument .................................................... 22

Argument ................................................................................ 24

I.  Mr. Alford's convictions on Counts Two and Three should be vacated because the evidence was insufficient for the jury to find he engaged in disorderly or disruptive conduct ...................................................................... 24

A.  Conduct that is disorderly or disruptive *by its nature* is an essential element under both 18 U.S.C. § 1752(a)(2) and 40 U.S.C. § 5104(e)(2)(D) .......................... 24

B.  Mr. Alford's conduct was not disorderly or disruptive by its nature ............................................................ 31

II.  The district court abused its sentencing discretion by giving too much weight to the fact Mr. Alford went to trial and the exceptionally long imprisonment range prescribed by the Sentencing Guidelines, and too little weight to the need to avoid unwarranted disparities .............. 35

A.  Reasonableness review of a sentence under 18 U.S.C. § 3553(a) ............................................................. 36

B.  There is a large disparity between Mr. Alford's sentence and those for other defendants with similar histories convicted of similar conduct ................................... 38

1.  Defendants convicted of conduct comparable to Mr. Alford's have received sentences many times shorter than his ................................................. 39

iii

2.    Defendants who have received comparable sentences were convicted of more serious crimes..................44

C.    The disparity is not warranted by Mr. Alford's going to trial or any other § 3553(a) factor....................47

Conclusion ........................................................53

Certificate of Compliance........................................54

Certificate of Service ...........................................55

iv

# TABLE OF AUTHORITIES

**Federal and State Cases**                                    **Page(s)**

*CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277 (2011) .......... 29

*Coggin v. State*, 123 S.W.3d 82 (Tex. Ct. App. 2003)..................... 30 n.12

\* *Gall v. United States*, 552 U.S. 38 (2007) ........................................ 38, 52

*Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) .................................. 28–29

\* *Nielsen v. Preap*, 139 S. Ct. 954 (2019).................................................. 27

*People ex rel. K.W.*, 317 P.3d 1237 (Colo. App. 2012) .................... 30 n.12

*Robinson v. State*, 615 So. 2d 112 (Ala. Crim. App. 1992) ............ 30 n.12

*United States v. Bostick*, 791 F.3d 127 (D.C. Cir. 2015)........................ 20

\* *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008)........... 21, 35

*United States v. Irey*, 612 F.3d 1160 (11th Cir. 2010) .......... 48–49, 52–53

\* *United States v. Mattea*, 895 F.3d 762 (D.C. Cir. 2018) ................... 21, 38

*United States v. Rivera*, 607 F. Supp. 3d 1 (D.D.C. 2022).......... 26, 32–34

*United States v. Sitzmann*, 893 F.3d 811 (D.C. Cir. 2018).................... 20

\* *Williams v. Taylor*, 529 U.S. 362 (2000) ................................................ 27

**United States Code**                                          **Page(s)**

18 U.S.C. § 2 ........................................................................................... 45

18 U.S.C. § 111(a)(1)................................................................. 45–47, 50

18 U.S.C. § 231(a)(3) ................................................ 44–47, 50 & n.45

18 U.S.C. § 875(c) ................................................................ 45–46

18 U.S.C. § 922(g)(1) .................................................................. 50

18 U.S.C. § 1512(c)(2) ........................................................... 44–47

18 U.S.C. § 1752(a)(1) ............................................ 6, 31, 43, 49

\* 18 U.S.C. § 1752(a)(2) ....................i, 1, 2, 6, 15, 22, 24–30, 32–35, 43, 49

18 U.S.C. § 3231 ........................................................................ xii

\* 18 U.S.C. § 3553(a) .................................... 2–4, 36–38, 47–48, 52

18 U.S.C. § 3624(b)(1) ...................................................... 46 & n.42

18 U.S.C. § 3742 ....................................................................... xii

28 U.S.C. § 1291 ...................................................................... xii

\* 40 U.S.C. § 5104(e)(2)(D) ....................i, 2, 4–6, 15, 22, 24–31, 34–35, 43

40 U.S.C. § 5104(e)(2)(G) ................................................... 6, 42

**State Statutes**                                                   **Page(s)**

Ala. Code § 13A-11-7(a)(3) (2022) ................................... 30 n.11

Ala. Code § 13A-11-7(a)(6) (2022) ................................... 30 n.13

Ariz. Rev. Stat. § 13-2904(A)(1) (2021) ........................... 30 n.10

Ark. Code Ann. § 5-71-207(a)(2) (2022) ............................ 30 n.9

Ark. Code Ann. § 5-71-207(a)(4) (2022) ............................ 27 n.8

Colo. Rev. Stat. § 18-9-106(1)(a) (2022) .................................. 30 nn.11–12

Conn. Gen. Stat. § 53a-182a(3) (2022) ........................................ 30 n.9

Ind. Code § 35-45-1-3(a)(2) (2022) ..................................................... 30 n.9

Iowa Code § 723.4(1)(d) (2022) ......................................................... 27 n.8

Kan. Stat. Ann. § 21-6203(a)(1) (2022) ........................................ 30 n.10

Ky. Rev. Stat. Ann. § 525.060(1)(c) (2022) .................................... 30 n.14

N.C. Gen. Stat. § 14-288.4(a)(4) (2022) ........................................ 30 n.14

N.C. Gen. Stat. § 14-288.4(a)(8) (2022) ........................................ 28 n.8

N.J. Stat. Ann. § 2C:33-2(a)(1) (2022) ........................................... 30 n.10

Tex. Penal Code Ann. § 42.01(a)(1)–(2) (2021) .............................. 30 n.11

**Federal Rules of Criminal Procedure**                                  **Page(s)**

* Fed. R. Crim. P. 29 ....................................................... 15–16, 20, 26, 35

**Federal Rules of Appellate Procedure**                              **Page(s)**

Fed. R. App. P. 4(b)(1)(A)(i) ................................................................ xii

Fed. R. App. P. 32 ............................................................................... 54

Fed. R. App. P. 34(a)(2) ........................................................................ i

**D.C. Circuit Rules**                                                              **Page(s)**

D.C. Cir. Rule 28(a)(1) ...................................................................... c-1

**United States Sentencing Guidelines**                    **Page(s)**

\* U.S.S.G. § 2A2.4 ................................................ 1, 17, 36, 49–52

U.S.S.G. § 2B2.3 ........................................................... 49

U.S.S.G. § 2K2.1(a)(7) ................................................... 50

\* U.S.S.G. § 3C1.1 ...................................................... 18, 50–52

U.S.S.G. § 5C1.1 ........................................................... 18

U.S. Sent'g Guidelines Manual App. A (U.S. Sent'g Comm'n 2021) ................................................................ 49–50 & n.44

**Secondary Sources**                                      **Page(s)**

27 C.J.S. *Disorderly Conduct* § 1 (Mar. 2023 Update) ........................... 29

Press Release, U.S. Dep't of Just., 27 Months Since the Jan. 6 Attack on the Capitol (Apr. 6, 2023), https://www.justice.gov /usao-dc/27-months-jan-6-attack-capitol .................................... 38–39

**Court Records in Other Actions**                         **Page(s)**

Dkt. Min. Entry May 20, 2022, *United States v. Timbrook*, No. 1:21-cr-00361-TNM-1 ........................................................ 42 n.24

Gov't Sent'g Mem., *United States v. Rivera*, No. 1:21-cr-00060-CKK-1 (D.D.C. Oct. 17, 2022), ECF No. 69 ......................................... 43 n.31

Judgment, *United States v. Andries*, No. 1:21-cr-00093-RC-1 (D.D.C. Jan. 18, 2023), ECF No. 76 ........................................... 44 n.35

Judgment, *United States v. Baugh*, No. 1:22-cr-00313-JEB-1 (D.D.C. Jan. 24, 2023), ECF No. 20 .......................................... 45 n.36

Judgment, *United States v. Cooke*, No. 1:22-cr-00052-RCL-1 (D.D.C. July 11, 2022), ECF No. 60 ........................................................ 45 n.37

Judgment, *United States v. Cramer*, No. 1:22-cr-00339-RDM-2 (D.D.C. Feb. 27, 2023), ECF No. 59 ............................................ 43 n.32

Judgment, *United States v. Curzio*, No. 1:21-cr-00041-CJN-2 (D.D.C. July 14, 2021), ECF No. 73 ............................................. 42 n.28

Judgment, *United States v. Evans*, No. 1:21-CR-00225-DLF-1 (D.D.C. Nov. 29, 2022), ECF No. 68 .......................................... 42 n.25

Judgment, *United States v. Fairchild*, No. 1:21-cr-00551-TFH-1 (D.D.C. Oct. 21, 2022), ECF No. 46 ............................................ 46–47

Judgment, *United States v. Grace*, No. 1:21-CR-00492-JDM-1 (D.D.C. July 13, 2022), ECF No. 41 .......................................... 42 n.27

Judgment, *United States v. Jancart*, No. 1:21-cr-00148-JEB-1 (D.D.C. Oct. 1, 2021), ECF No. 33 .............................................. 41 n.22

Judgment, *United States v. Knutson*, No. 1:22-cr-00031-FYP-1 (D.D.C. Aug. 30, 2022), ECF No. 35 .......................................... 43 n.30

Judgment, *United States v. Leffingwell*, No. 1:21-cr-00005-ABJ-1 (D.D.C. Feb. 18, 2022), ECF No. 51 ................................................... 46

Judgment, *United States v. Mehaffie*, No. 1:21-cr-00040-TNM-7 (D.D.C. Mar. 9, 2023), ECF No. 575 .......................................... 45 n.41

Judgment, *United States v. Michetti*, No. 1:21-cr-00232-CRC-1 (D.D.C. Sept. 8, 2022), ECF No. 54 .................................................. 47

Judgment, *United States v. Mostofsky*, No. 1:21-cr-00138-JEB (D.D.C. May 6, 2022), ECF No. 110 ................................................... 47

Judgment, *United States v. Peterson*, No. 1:21-CR-00309-ABJ-1 (D.D.C. Dec. 15, 2021), ECF No. 35 .......................................... 42 n.26

ix

Judgment, *United States v. Presley*, No. 1:21-cr-00257-RDM-1 (D.D.C. Dec. 1, 2022), ECF No. 56............................................44 n.33

Judgment, *United States v. Rahm*, No. 1:21-cr-00150-RJL-1 (D.D.C. Jan. 19, 2023), ECF No. 71.........................................44 n.34

Judgment, *United States v. Rivera*, No. 1:21-cr-00060-CKK-1 (D.D.C. Nov. 10, 2022), ECF No. 82 ...........................................43 n.31

Judgment, *United States v. Romero*, No. 1:21-cr-00677-TSC (D.D.C. Aug. 11, 2022), ECF No. 36 ........................................45 n.38

Judgment, *United States v. Ryals*, No. 1:21-cr-00244-CKK-1 (D.D.C. Oct. 27, 2022), ECF No. 86 .....................................47

Judgment, *United States v. Sargent*, No. 1:21-cr-00258-TFH-1 (D.D.C. Dec. 14, 2022), ECF No. 74...........................................45 n.39

Judgment, *United States v. Scavo*, No. 1:21-cr-00254-RCL-1 (D.D.C. Nov. 22, 2021), ECF No. 48 ...........................................42 n.23

Judgment, *United States v. Simon*, No. 1:21-cr-00346-BAH-1 (D.D.C. Aug. 12, 2022), ECF No. 69 ...........................................43 n.29

Judgment, *United States v. Smocks*, No. 1:21-cr-00198-TSC (D.D.C. Dec. 3, 2021), ECF No. 67........................................45 n.40

Judgment, *United States v. Young*, No. 1:21-cr-00617-DLF-1 (D.D.C. Feb. 7, 2023), ECF No. 38.....................................47

Statement of Offense, *United States v. Cramer*, No. 1:22-cr-00339-RDM-2 (D.D.C. Oct. 25, 2022), ECF No. 37 ...............................43 n.32

Statement of Offense, *United States v. Curzio*, No. 1:21-cr-00041-CJN-2 (D.D.C. July 14, 2021), ECF No. 71 ................................42 n.28

Statement of Offense, *United States v. Evans*, No. 1:21-CR-00225-DLF-1 (D.D.C. Mar. 10, 2022), ECF No. 33 ...............................40 n.18

Statement of Offense, *United States v. Grace*, No. 1:21-CR-00492-
    JDM-1 (D.D.C. Apr. 8, 2022), ECF No. 31 ................................. 40 n.20

Statement of Offense, *United States v. Jancart*, No. 1:21-cr-00148-
    JEB-1 (D.D.C. July 23, 2021), ECF No. 21 ............................... 40 n.15

Statement of Offense, *United States v. Knutson*, No. 1:22-cr-00031-
    FYP-1 (D.D.C. Apr. 13, 2022), ECF No. 24 ............................... 43 n.30

Statement of Offense, *United States v. Peterson*, No. 1:21-CR-
    00309-ABJ-1 (D.D.C. Sept. 8, 2021), ECF No. 22 ..................... 40 n.19

Statement of Offense, *United States v. Scavo*, No. 1:21-cr-00254-
    RCL-1  (D.D.C. Sept. 8, 2021), ECF No. 33 ............................... 40 n.16

Statement of Offense, *United States v. Simon*, No. 1:21-cr-00346-
    BAH-1 (D.D.C. Apr. 29, 2022), ECF No. 52 ............................... 43 n.29

Statement of Offense, *United States v. Timbrook*, No. 1:21-cr-
    00361-TNM-1 (D.D.C. Feb. 9, 2022), ECF No. 34 ..................... 40 n.17

# STATEMENT OF JURISDICTION

This is a direct appeal from a final judgment in a criminal case. The United States District Court for the District of Columbia had original subject matter jurisdiction under 18 U.S.C. § 3231. The district court entered judgment on February 8, 2023. (App. 1358–64.) Mr. Alford timely invoked this Court's jurisdiction by filing a notice of appeal on February 14, 2023 (App. 1366), within the 14 days provided by Fed. R. App. P. 4(b)(1)(A)(i). This Court has appellate jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

# INTRODUCTION

Mr. Alford was convicted of four misdemeanor offenses for entering the Capitol Building on January 6, 2021. That day, after attending then-President Trump's rally at the Ellipse, he walked a wide path around the Capitol that kept him far from protesters' clashes with police, then approached the building on its east side, where police were not engaging with protesters. After someone inside the building opened the Upper House Door, Mr. Alford, who had been standing on the landing outside, walked a short distance inside and stood silently against a wall for about ten minutes before police arrived to clear the hallway. His convictions include two for engaging in disorderly or disruptive conduct; the district court denied judgment of acquittal because it held that mere presence in the Capitol could constitute disorderly or disruptive conduct.

The Sentencing Guidelines treat one of the disorderly-or-disruptive-conduct counts, charged under 18 U.S.C. § 1752(a)(2), as a conviction for obstructing or impeding officers, *see* U.S.S.G. § 2A2.4. That guideline produces sentencing ranges that align with sentences imposed for January 6 felonies but are many times longer than for other defendants who were convicted of mere presence in the Capitol. The district court held

that the sentencing disparity was warranted, though, noting that Mr. Alford put himself in a worse position by going to trial and testifying. The court imposed the maximum sentence for each count.

## STATEMENT OF THE ISSUES

I.    Was the evidence insufficient to prove that Mr. Alford engaged in disorderly or disruptive conduct under 18 U.S.C. § 1752(a)(2) and 40 U.S.C. § 5104(e)(2)(D)?

II.   Did the district court abuse its discretion in weighing the 18 U.S.C. § 3553(a) sentencing factors and impose a substantively unreasonable prison sentence?

## STATUTES AND REGULATIONS

**18 U.S.C. § 1752(a)(1)–(2).**

**(a)** Whoever—

> **(1)** knowingly enters or remains in any restricted building or grounds without lawful authority to do so; [or]

> **(2)** knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

> * * *

or attempts or conspires to do so, shall be punished as provided in subsection (b).

2

**18 U.S.C. § 3553(a).**

**(a) Factors to be considered in imposing a sentence.**—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed—

    **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    **(B)** to afford adequate deterrence to criminal conduct;

    **(C)** to protect the public from further crimes of the defendant; and

    **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for—

    **(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—

        **(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(ii)** that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

**(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

**(5)** any pertinent policy statement—

**(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

**40 U.S.C. § 5104(2)(2)(D), (G).**

**(2) Violent entry and disorderly conduct.**—An individual or group of individuals may not willfully and knowingly—

\* \* \*

4

**(D)** utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress; [or]

* * *

**(G)** parade, demonstrate, or picket in any of the Capitol Buildings.

## STATEMENT OF THE CASE

### I.   Course of Proceedings and Dispositions in the Court Below

Mr. Alford was charged with four misdemeanor counts based on his actions at the United States Capitol on January 6, 2021: entering or remaining in a restricted building, in violation of 18 U.S.C. § 1752(a)(1) (Count One); disorderly or disruptive conduct in a restricted building, in violation of § 1752(a)(2) (Count Two); disorderly or disruptive conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Three); and parading, demonstrating, or picketing in a Capitol Building, in violation of § 5104(e)(2)(G) (Count Four). (App. 23–24.) A jury found him guilty of all four counts. (App. 37.) The district court sentenced Mr. Alford to concurrent statutory-maximum prison terms on all four counts: 12 months on Counts One and Two and 6 months on Counts Three and Four, with 12 months' supervised release to follow. (App. 1359–60.)

Mr. Alford is on bond and has been ordered to self-surrender for service of his sentence by May 22, 2023. He appeals his convictions and sentence.

## II.   Statement of the Facts

### A.   General Evidence about Events of January 6, 2021

At trial, the government presented evidence that on January 6, 2021, Congress was in session in the Capitol Building for the certification of the Electoral College vote. (App. 323.) Then-President Trump held a rally at the Ellipse near the White House, at which he spoke from about 12:00 to 1:10 p.m. (App. 399; Government Exhibit ("Gov't Ex.") 600 at 1 (fact stipulation)).

Even before his speech ended, large numbers of persons who had attended the rally walked toward the Capitol. (Gov't Ex. 100 at 00:00:45–00:00:55.) Shortly before 1:00, a crowd formed on a paved path leading from Peace Circle toward the West Front of the Capitol, and members of the crowd overran bicycle-rack barriers and officers posted at the location. (Defense Exhibit ("Def. Ex.") 38a at 00:03:00–00:04:00; App. 400–01.) Around the same time, a smaller group breached bike racks standing across a path from Garfield Circle toward the West Front. (Def. Ex. 51 at 00:01:15–00:02:00; App. 414–15.) People surged forward across the west lawn of the Capitol Grounds, tearing down a line of plastic snow fence bearing "Area Closed" signs. (Gov't Exs. 403, 404; Def. Ex. 50 at 00:01:45–

00:05:00; App. 407–10.) A short while later, at about 1:12 p.m.—as then-President Trump's speech ended (Gov't Ex. 600 at 1)—Capitol security video showed a person removing snow fence across the southwest lawn of the Grounds. (Def. Ex. 51 at 00:17:30–00:19:00; App. 414–15.)

At 1:58 p.m., protesters began removing bike-rack barriers surrounding the Capitol's east plaza; a large group then moved across the plaza and onto the center stairs on the East side. (Def. Ex. 39a at 00:02:45–00:03:15; Def. Ex. 40a at 00:01:30–00:04:00.) On the West Front, at 2:12 p.m., members of the crowd broke windows and entered the Capitol Building. (Gov't Ex. 100 at 00:04:10–00:05:40.) As more of them surrounded the Capitol and continued to stream in, they opened doors to let others enter. (*See, e.g.*, *id.* at 00:07:50–00:08:00, 00:08:40–00:09:15, 00:14:00–00:15:15.)

The Electoral College vote certification was interrupted by the presence of protesters inside the Capitol. (App. 373.) The Senate recessed at 2:13 p.m. (Gov't Ex. 101 at 00:05:10–00:05:25), and the House at 2:18 p.m. (*id.* at 00:06:50–00:07:05). The House briefly reconvened at 2:26 but recessed again just three minutes later. (*Id.* at 00:07:10–00:07:45.) Neither chamber could resume the Electoral vote certification proceedings

until protesters had been cleared and the Capitol secured. (App. 371.) After the building was secured, the Senate reconvened at 8:06 p.m., and the House at 9:02 p.m. (Gov't Ex. 101 at 00:08:00–00:08:30.) The joint session of Congress continued the vote certification into the morning, completing it at 3:40 a.m. and adjourning at 3:44 a.m. on January 7. (*Id.* at 00:08:45–00:09:20.)

## B.    Evidence about Mr. Alford's Actions

### 1.    Mr. Alford's path to the East Front of the Capitol kept him at a distance from the largest and unruliest crowds.

Mr. Alford drove with a friend from Alabama to Washington, D.C., on January 5, 2021, because they wanted to attend the rally. (App. 910–11.) They stayed the night at a hotel in the Virginia suburbs. (*Id.*) The next morning, January 6, Mr. Alford went to the rally site and by 9:00 arrived where a large crowd had gathered between the Washington Monument and the Ellipse. (*Id.* at 771; *see also* Def. Ex. 9.) He remained through the end of then-President Trump's speech, then waited while the crowd began to disperse before following others toward the Capitol. (App. 926.)

The National Mall and Constitution Avenue to its immediate north were especially congested with people, so Mr. Alford veered to the south and walked east to the Capitol along Independence Avenue, which was less crowded. (App. 928–29.) It was nearly 2:00 p.m. when he reached the eastern end of the Mall at 3rd Street; he took a photo looking west toward the Washington Monument at 1:56 p.m., and another looking east at the Capitol Building and Reflecting Pool at 1:58. (App. 930–32; Def. Exs. 13, 14.) Large crowds had gathered on the Capitol Grounds when he arrived there, passing Garfield Circle in the southwest quadrant of the Grounds at 2:02 p.m. (Def. Ex. 17b; App. 428–29.) Snow fence and bicycle racks with "area closed" signs had been removed there and along the south end of the Grounds where he walked, except for a ring of bike racks surrounding Garfield Circle. (App. 429, 431.)

By 2:08 p.m., Mr. Alford was on the east side of the Capitol at the House (south) end of the building. (App. 439; Def. Ex. 20b.) There too, barriers had been moved, and a large crowd stood on the east center stairs. (Def. Exs. 22a, 23, 24.) Mr. Alford remained on the east plaza, standing on the periphery of the crowd at the center of the Capitol Building for about half an hour, from approximately 2:10 to 2:38 p.m. (App.

10

443–44, 504–06; Def. Ex. 22d.) He then walked toward the southeast of the building and up the House stairs. (Def. Ex. 25b.) He reached the top of the stairs at 2:40 p.m. (*Id.*)

### 2. Mr. Alford was inside the Capitol for about 13 minutes, during which he largely stood stationary and silent.

Less than two minutes later, a protester inside the Capitol Building opened the Upper House Door, the exterior door onto the crowded landing where Mr. Alford stood. (Def. Ex. 27 at 00:00:10–00:00:22.) People flowed in from outside—including, about a minute after the door opened, Mr. Alford at 2:43 p.m. (*Id.* at 00:00:20–00:01:30.) He was identifiable by his backward cap, sunglasses, and gray ponytail:



(*Id.* at 00:01:36; *see also* Gov't Ex. 601 (joint stipulation identifying Mr. Alford).)

Over the next 11 minutes, video recordings showed Mr. Alford standing by a door frame at the end of the Upper House Door foyer . . .



and against a wall adjacent to that door frame . . .



(Def. Ex. 28 at 00:04:35; Gov't Ex. 109 at 00:09:12.) He recorded videos on his phone (Gov't Exs. 205–210), and they, like videos recorded by

12

officers' body-worn cameras (Gov't Exs. 108–110, 113), captured footage of some protesters chanting, yelling, and banging on doors. But there was no evidence that Mr. Alford did the same or even spoke while he was in the Capitol. (App. 733–34.)

About 10 minutes after Mr. Alford entered, Metropolitan Police Department ("MPD") officers arrived to clear the hallway. (Gov't Ex. 108 at 00:08:20–00:08:40.) At approximately 2:53 p.m., a line of officers passed the point where Mr. Alford stood against a wall to their left.



(*Id.* at 00:08:44.) A minute later, he passed officers as part of a throng headed toward the Upper House Door.



(Gov't Ex. 109 at 00:09:44.)

When Mr. Alford reached the doors, only one of them was open, and

he was caught in a bottleneck.



(Def. Ex. 35 at 00:06:10.) An MPD Lieutenant, Ashley Mancuso, was positioned near the exit and told other officers, "It's a small door. Give 'em time to get out. Don't push." (Gov't Ex. 108 at 00:11:45–00:11:50; *see also* App. 583 (identifying rank on Jan. 6, 2021), 610.) Mr. Alford stood by the doors until the one nearer to him opened, then promptly left the building. (Def. Ex. 35 at 00:08:10–00:08:20.)

## C.    Motion for Judgment of Acquittal

After the government rested, Mr. Alford moved for judgment of acquittal on all four counts under Federal Rule of Criminal Procedure 29. (App. 26–28.) Regarding Count Two, disorderly or disruptive conduct in violation of § 1752(a)(2), his written motion argued that the evidence was insufficient for the jury to find "that Mr. Alford engaged in disorderly or disruptive conduct," or that he "intended to impede or disrupt Congress," or that "disorderly or disruptive conduct by Mr. Alford in fact impeded or disrupted Congress." (App. 27; *see also id.* at 842–43 (oral motion).) And as to Count Three, disorderly or disruptive conduct in violation of § 5104(e)(2)(D), the motion argued that the evidence was insufficient

"that Mr. Alford engaged in disorderly or disruptive conduct" or "intended to impede, disrupt, or disturb Congress." (App. 27; *see also id.* at 843.)[1]

The district court denied the motion. (*Id.* at 902–03.) It found sufficient evidence that Mr. Alford engaged in disorderly and disruptive conduct by his "mere presence": "Mr. Alford's mere presence inside the Capitol disturbed the public peace or undermined public safety. . . . [H]is presence was an aspect of the disorder and disruption of the Capitol on January 6." (*Id.* at 898–99 (explaining denial of Rule 29 motion as to Count Two); *see also id.* at 900 (denying motion as to Count Three "for the reasons I laid out in addressing Count 2").) The defense renewed the motion after resting its case, and the court again denied it, "for the reasons stated earlier . . . ." (*Id.* at 1105–06.)

## D.    Sentencing

Mr. Alford is one of many January 6 defendants who entered the Capitol Building unarmed and without violence to property or other persons, and who were charged with the same set of four misdemeanors,

---

[1] Mr. Alford also filed a written reply (App. 30–35) to a written response in opposition that the government hand-served on his counsel and the district court (*see id.* at 30 n.1). The government's response apparently was never made part of the record, as it does not appear on the district court docket sheet.

*see supra* p. 6. Most pleaded guilty to one count, had the other three dismissed, and received sentences of probation, or several weeks' home detention, or a few weeks' incarceration. (*See* App. 1336–41, 1355–56.) But Mr. Alford went to trial and was convicted of all four counts. At sentencing, he argued that imposing a sentence within the Guidelines range would treat him far more harshly than others whose conduct was comparable to or more severe than his, creating unwarranted sentencing disparities and effectively punishing him for exercising constitutionally protected rights by going to trial and testifying in his own defense. (*See* App. 1335–41.)

He also argued that the court should not give undue weight to his Sentencing Guidelines range—10 to 16 months' imprisonment (Sent'g Tr. 8[2])—because two aspects of the Guidelines calculation drove the range upward to an extent that was disproportionate to the conduct those aspects were based on. First, he argued that the guideline for Count Two, U.S.S.G. § 2A2.4, contemplates conduct significantly more severe than Mr. Alford's and prescribes sentences that are accordingly severe. (*See*

---

[2] Mr. Alford's counsel received a copy of the sentencing transcript on March 15, 2023, but at the time of this filing the transcript does not yet appear on the district court's CM/ECF docket. Counsel nevertheless cites it and includes it in the Appendix.

*id.* at 13–16.) Second, he argued that although the obstruction-of-justice adjustment under U.S.S.G. § 3C1.1 "comport[ed] with the letter of the Guidelines Manual" because of Mr. Alford's testimony at trial (*id.* at 14), it is a one-size-fits-all provision that was an oversized fit for his conduct (*id.* at 14–15).

Mr. Alford's counsel asked the court "to impose a sentence of not more than 5 months in custody" to "avoid an unwarranted sentencing disparity and appropriately balance the other applicable statutory sentencing factors." (*Id.* at 2.) And despite the above-described arguments against the reasonableness of the Guidelines range, his counsel noted that the requested sentence, if imposed as "a 5-month custodial sentence, to be followed by a 5-month term of home confinement," would not require any variance from the Guidelines range. (*Id.*; *see also* U.S.S.G. § 5C1.1(d)(2), (e)(3) (providing that for sentencing ranges in Zone C of the Sentencing Table, like Mr. Alford's, a sentence may be composed of equal-length terms of imprisonment and home confinement).)

At sentencing, the district court told Mr. Alford he "had an absolute right" to go to trial and testify in his own defense, and "you won't be

punished for that." (Sent'g Tr. 37.) But the court said that his testimony

justified a longer sentence:

> I do not believe your testimony was entirely candid. I believe
> it was disingenuous. And I don't believe it was entirely
> truthful. I would be far more inclined to give you a harsher
> sentence if I believed you testified and told deliberate
> falsehoods. I don't think that was the case, but I don't think it
> was candid. And I believe it showed a lack of awareness for
> the seriousness and gravity of what happened [on January 6].

(*Id.* at 38–39.)

The court also explained that it believed a disparity between Mr.

Alford's sentence and those for defendants who pleaded guilty to similar

conduct was warranted:

> I understand your point . . . about sentences I've given to other
> misdemeanors. But I haven't sentenced any defendant yet
> who has gone the trial [sic], much less one who has testified.
> And the fact of the matter is had Mr. Alford decided to accept
> the plea offer, and his right not to, but had he, he would have
> already minimized his exposure significantly. He chose not to,
> and he chose to go to trial as his right. I'm not going to
> penalize him for that. But the fact is he doesn't get the benefit
> of acceptance of responsibility and assistance to the govern-
> ment that he would have with a plea offer.
>
>     And he chose to testify, which he didn't have to do. And I
> do assess the credibility of his testimony in deciding what
> punishment to give. And so he is not similarly situated with
> those defendants. And, therefore, I don't consider—in my dis-
> parity analysis, I don't consider those necessarily comparable.

(*Id.* at 41–42.)

The court imposed a 12-month term of imprisonment. (App. 1359.)
Mr. Alford's counsel objected: "[F]or the reasons set forth in our pleading
that I argued, I do object to the sentence. I respectfully disagree that it's
not disparate in connection with others, and particularly with the impact
of this guideline range." (Sent'g Tr. 50.)

## III.   Statement of the Standards of Review

In Part I of the Argument, Mr. Alford challenges the district court's
denial of his motion for judgment of acquittal on Counts Two and Three—
specifically, the court's determination that there was sufficient evidence
Mr. Alford engaged in disorderly or disruptive conduct. This Court
"review[s] the District Court's denial of a motion for judgment of acquittal
*de novo.*" *United States v. Sitzmann*, 893 F.3d 811, 821 (D.C. Cir. 2018)
(citing *United States v. Kayode*, 254 F.3d 204, 212 (D.C. Cir. 2001)). That
review employs the same sufficiency-of-the-evidence standard as the
district court's Rule 29 ruling: whether, "after viewing the evidence in the
light most favorable to the prosecution, *any* rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt."
*United States v. Bostick*, 791 F.3d 127, 137 (D.C. Cir. 2015) (quoting
*United States v. Gaskins*, 690 F.3d 569, 576 (D.C. Cir. 2012)).

In Part II of the Argument, Mr. Alford challenges the substantive reasonableness of the district court's sentence. This Court reviews such claims for abuse of discretion. *United States v. Mattea*, 895 F.3d 762, 766 (D.C. Cir. 2018) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Wilson*, 605 F.3d 985, 1034 (D.C. Cir. 2010)). The Court's "review for substantive reasonableness is 'quite deferential,' and it will be an 'unusual case when [the Court] can plausibly say that a sentence is so unreasonably high or low' as to warrant reversal." *Id.* at 765 (citations omitted) (quoting *United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008)). Because Mr. Alford's "sentence [is] within a properly calculated Guidelines range," it "is entitled to a rebuttable presumption of reasonableness" on appeal. *Id.* (quoting *United States v. Law*, 806 F.3d 1103, 1106 (D.C. Cir. 2015)).

## SUMMARY OF THE ARGUMENT

The crowds inside the Capitol Building on January 6, 2021, included many people who "engage[d] in disorderly or disruptive conduct," 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D). But some didn't. Mr. Alford walked a short distance inside, stood silently against a wall for about ten minutes, then headed for the door when police told the crowd to leave. That was sufficient for a jury to find he knowingly entered or remained in a restricted area (Count One) and that he demonstrated inside the Capitol Building (Count Four). But the district court held it also was sufficient evidence that Mr. Alford engaged in disorderly or disruptive conduct, and the court denied his motion for judgment of acquittal on two counts with that conduct element.

The court erred in denying that motion, a ruling that rested on the court's conclusion that mere presence may satisfy the conduct elements of § 1752(a)(2) and § 5104(e)(2)(D). In both of those provisions, Congress criminalized conduct intended to disrupt proceedings in the Capitol. But not *all* conduct is covered. Instead, both laws are expressly limited to *disorderly or disruptive* conduct. The district court read that limitation out of the statutes in holding that Mr. Alford's mere presence in the

22

Capitol could suffice. The statutes require more than mere presence, and no reasonable jury could find that the evidence showed Mr. Alford behaved in a disorderly or disruptive manner. The court erred by denying his motion for judgment of acquittal on Counts Two and Three.

Consistent with the idea that Count Two requires serious misconduct, the Sentencing Guidelines prescribed an unusually harsh imprisonment range for that conviction, 10 to 16 months. Other January 6 defendants sentenced in that range were convicted of felonies; when defendants convicted of mere presence in the Capitol have received custodial sentences, they seldom have been more than a few weeks. But the district court rejected Mr. Alford's argument that a sentence in the Guidelines range would subject him to unwarranted disparate treatment, noting that he went to trial and that the court found he testified disingenuously about his mental states. In imposing the statutory maximum for every count and a total 12-month sentence, the court gave unreasonable weight to the Guidelines range and the fact Mr. Alford went to trial, and too little weight to avoiding unwarranted disparities. It is substantively unreasonable, and if the convictions are affirmed, the sentence should be

vacated and the case remanded for the district court to impose a reasonable sentence.

## ARGUMENT

### I. Mr. Alford's convictions on Counts Two and Three should be vacated because the evidence was insufficient for the jury to find he engaged in disorderly or disruptive conduct.

#### A. Conduct that is disorderly or disruptive *by its nature* is an essential element under both 18 U.S.C. § 1752(a)(2) and 40 U.S.C. § 5104(e)(2)(D).

Mr. Alford's convictions on Counts Two and Three each required the jury to find, as an essential element, that he "engage[d] in disorderly or disruptive conduct." 18 U.S.C. § 1752(a)(2); 40 U.S.C. § 5104(e)(2)(D).[3] That conduct element, the actus reus for each offense, imposes a substantive requirement independent of the harm element that § 1752(a)(2) also requires, and of the intent element that each statute requires.

---

[3] By § 5104(e)(2)(D)'s text, even if a defendant has not "engage[d] in disorderly or disruptive conduct" the conduct element is satisfied where he "utter[ed] loud, threatening, or abusive language . . . ." But here, there was no evidence Mr. Alford used proscribed language. The government's closing argument conceded that point: "there's no evidence that he said a word when he was in the Capitol . . . ." (App. 1217.) Because the evidence could not support a finding that Mr. Alford used proscribed language, the remaining question under § 5104(e)(2)(D) is the same as under § 1752(a)(2)—whether there was sufficient evidence that he engaged in disorderly or disruptive conduct.

24

Section 1752(a)(2)[4] prescribes a mental-state element, a conduct element, and a harm element[5]:

- "knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions" (mental state);

- "engag[ing] in disorderly or disruptive conduct" (conduct); and

- "such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions" (harm).

Section 5104(e)(2)(D)[6] includes similar mens rea and conduct elements[7]:

- "willfully and knowingly" and "with the intent to impede, disrupt, or disturb the orderly conduct of" certain congressional business (mental state); and

---

[4] The full text of § 1752(a)(2) defines a violation as follows:

knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engag[ing] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions . . . .

[5] The statute also limits its proscription to "any restricted building or grounds," defined in § 1752(c)(1).

[6] In full, § 5105(e)(2)(D) provides,

An individual or group of individuals may not willfully and knowingly . . . utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress . . . .

[7] Section 5104(e)(2)(D), like § 1752(a)(2), contains a place limitation: "any place in the Grounds or in any of the Capitol Buildings . . . ."

25

- "utter[ing] loud, threatening, or abusive language, or engag[ing] in disorderly or disruptive conduct" (conduct).

By limiting the statutes' reach to *disorderly or disruptive* conduct, Congress criminalized only certain types of conduct—even where a defendant *intends* disruption and (in § 1752(a)(2)) actually causes it.

The government argued at trial that Mr. Alford engaged in disorderly or disruptive conduct by his mere presence in the Capitol. (App. 1194.) And in denying Mr. Alford's Rule 29 motion, the court cited with approval another district court's reasoning in *United States v. Rivera*, 607 F. Supp. 3d 1 (D.D.C. 2022),

> Judge Kollar-Kotelly's analogy to "raindrops in a flood" . . . is particularly apt. Mr. Alford may have just been one of many people in the Capitol that day, and he may not stand accused of any violent conduct, but his presence was an aspect of the disorder and disruption of the Capitol on January 6.

(App. 899.) In *Rivera*, the court held that mere presence could constitute disorderly and disruptive conduct:

> Even mere presence in an unlawful mob or riot is both (1) "disorderly" in the sense that it furthers the mob's "disturb[ing] the public peace" and (2) "disruptive" insofar as it disturbs the normal and peaceful condition of the Capitol grounds and buildings, its official proceedings, and the safety of its lawful occupants.

607 F. Supp. 3d at 8.

26

That interpretation reads the requirement of disorderly or disruptive *conduct* out of the statutes. That conduct element does not, and cannot, mean conduct *simpliciter*. Reading §§ 1752(a)(2) and 5104(e)(2)(D) in a way that any conduct would suffice if a person intentionally caused disruption would make Congress's specification of *disorderly or disruptive* conduct "entirely redundant," violating the interpretive canon against surplusage. *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019) (quoting *Kungys v. United States*, 485 U.S. 759, 778 (1988) (plurality opinion of Scalia, J.)). That canon embodies the "cardinal principle of statutory construction that [courts] must 'give effect, if possible, to every clause and word of a statute.'" *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (opinion of O'Connor, J., for the Court) (quoting *United States v. Menasche,* 348 U.S. 528, 538–39 (1955)).

In § 1752(a)(2), for example, such a reading would collapse the conduct element into the harm element: as long as government business is intentionally disrupted, *any* conduct could be "disorderly or disruptive" conduct. It is possible to write a statute to accomplish that.[8] But Congress

---

[8] *See, e.g.*, Iowa Code § 723.4(1)(d) (2022) ("A person commits a simple misdemeanor when the person . . . [w]ithout lawful authority or color of authority . . . disturbs any lawful assembly or meeting of persons **by conduct** *intended to disrupt the meeting or assembly*." (emphasis added)); Ark. Code Ann. § 5-71-207(a)(4) (2022) ("A person com-

didn't write such a statute here; in both § 1752(a)(2) and § 5104(e)(2)(D), it narrowed the types of conduct to only disorderly or disruptive conduct. Those limiting adjectives refer to the *character* of the conduct, independent of both its intended effect (which the intent elements cover) and its actual effect (which § 1752(a)(2)'s harm element covers; § 5104(e)(2)(D) has no harm element).

Reading the requirement of *disorderly or disruptive* conduct as a substantive limitation is also supported, at least in § 5104(e)(2)(D), by two other (and closely related) canons of statutory interpretation, known by the Latin phrases *noscitur a sociis* and *ejusdem generis*. The former embodies the idea that "a word is known by the company it keeps," and it counsels courts "to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307

---

mits the offense of disorderly conduct if, with the purpose to cause . . . or recklessly creating a risk of public inconvenience, annoyance, or alarm, he or she . . . ***[d]isrupts or disturbs*** *any lawful assembly or meeting* of persons" (emphasis added)); N.C. Gen. Stat. § 14-288.4(a)(8) (2022) ("Disorderly conduct is a public disturbance intentionally caused by any person who . . . ***[e]ngages in conduct*** *with the intent to impede, disrupt, disturb, or interfere with the orderly administration* of any funeral, memorial service, or family processional" (emphasis added)).

28

(1961)). Similarly, "the canon of *ejusdem generis* . . . 'limits general terms [that] follow specific ones to matters similar to those specified,'" *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 294 (2011) (quoting *Gooch v. United States*, 297 U.S. 124, 128 (1936)).

Reading § 5104(e)(2)(D) in the light of those principles bolsters the conclusion that "disorderly or disruptive conduct" contemplates conduct that is disorderly or disruptive in nature, not merely effect. "[T]he company [that phrase] keeps," *Gustafson*, 513 U.S. at 575, includes conduct that is inherently disorderly or disruptive, not conduct *simpliciter*: "utter[ing] *loud, threatening, or abusive* language, or engag[ing] in *disorderly or disruptive* conduct," § 5104(e)(2)(D) (emphasis added).

Mr. Alford's counsel has been unable to find any appellate precedent holding that mere presence may constitute disorderly or disruptive conduct under either § 1752(a)(2) or § 5104(e)(2)(D), and the statutes' plain language does not clearly warn that either of them could be stretched so far. "Disorderly or disruptive conduct" is not a term of art with a fixed meaning, either at common law, *see* 27 C.J.S. *Disorderly Conduct* § 1 (Mar. 2023 Update) ("At common law, there was no offense known as 'disorderly conduct'"), or otherwise. It is statutorily defined,

and definitions vary across jurisdictions. But such statutes often specify conduct like making unreasonable noise;[9] engaging in fighting or other violence;[10] and abusive, obscene, or offensive language or conduct,[11] usually judicially limited to unprotected speech like fighting words or true threats.[12]

Where mere presence *may* suffice as disorderly conduct, statutes ordinarily say so and limit the prohibition to presence after a warning to leave—most often "refus[ing] to comply with a lawful order of law enforcement to disperse"[13] or the like.[14] So even if § 1752(a)(2) and

---

[9] *See, e.g.*, Ark. Code Ann. § 5-71-207(a)(2) (2022); Conn. Gen. Stat. § 53a-182(a)(3) (2022); Ind. Code § 35-45-1-3(a)(2) (2022).

[10] *See, e.g.*, Ariz. Rev. Stat. § 13-2904(A)(1) (2021); Kan. Stat. Ann. § 21-6203(a)(1) (2022); N.J. Stat. Ann. § 2C:33-2(a)(1) (2022).

[11] *See, e.g.*, Ala. Code § 13A-11-7(a)(3) (2022); Colo. Rev. Stat. § 18-9-106(1)(a) (2022); Tex. Penal Code Ann. § 42.01(a)(1)–(2) (2021).

[12] *Robinson v. State*, 615 So. 2d 112, 113 (Ala. Crim. App. 1992) ("[T]he words 'abusive or obscene language' and 'obscene gesture' have been 'interpreted narrowly to apply only to "fighting words."'" (quoting *Swann v. City of Huntsville*, 455 So. 2d 944, 950 (Ala. Crim. App. 1984))); *People ex rel. K.W.*, 317 P.3d 1237, 1241–42 (Colo. App. 2012) (holding that § 18-9-106(1)(a)'s limitation to conduct that "tends to incite an immediate breach of the peace" confines scope to fighting words); *Coggin v. State*, 123 S.W.3d 82, 87 (Tex. Ct. App. 2003) (holding that § 42.01(a)(2)'s limitation to conduct that "tends to incite an immediate breach of the peace" confines scope to fighting words).

[13] Ala. Code § 13A-11-7(a)(6) (2022).

[14] Ky. Rev. Stat. Ann. § 525.060(1)(c) (2022) ("[r]efus[ing] to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard, or other emergency"); N.C. Gen. Stat. § 14-288.4(a)(4) (2022) ("[r]efus[ing] to vacate any building or facility of any public or private educational institution in obedience to any [order of a public official]").

§ 5104(e)(2)(D) may be read to incorporate common legal definitions of disorderly or disruptive conduct, those definitions criminalize conduct that by its nature is more disorderly or disruptive than mere presence.

### B. Mr. Alford's conduct was not disorderly or disruptive by its nature.

Mr. Alford's conduct at the Capitol was well documented on video, and at trial there was no serious dispute about its nature. He entered through a door someone had opened from the inside, walked a short distance through the Upper House Door foyer, and stood against the wall until police cleared the hallway. To the extent there was any dispute, it was whether he unreasonably remained at the door before leaving. (*See supra* p. 14; App. 1199–1200.) But that dispute related to the Count One allegation that Mr. Alford "knowingly *enter[ed] or remain[ed]* in any restricted building or grounds without lawful authority," § 1752(a)(1) (emphasis added)—a conviction he does not challenge on appeal—*not* whether he engaged in disorderly or disruptive conduct. (*See* App. 1200.)

The government acknowledged in closing that "there's no evidence that he said a word when he was in the Capitol . . . ." (*Id.* at 1217.) But that didn't matter, the government argued: Mr. Alford engaged in disor-

derly or disruptive conduct by his mere presence in the Capitol. (*Id.* at 1194 ("When the defendant enters, as shown in Exhibit 103, he's guilty of the offenses. . . . [H]e is guilty of the disorderly and disruptive conduct charges . . . .").) What was his disorderly or disruptive conduct? "[H]e was in that building, . . . he was in the hallway . . . ." (*Id.* at 1217.)

The district court agreed with that characterization. At sentencing, the court acknowledged that Mr. Alford was "just . . . standing around, taking pictures . . . ." (Sent'g Tr. 36.) In denying judgment of acquittal, the court concluded that while he was "not . . . accused of any violent conduct" (App. 899), the jury could find his conduct was disorderly because he was standing around, taking pictures *in the Capitol*. "Mr. Alford's mere presence inside the Capitol" was sufficient, the court held, because of the effect of having so many people in the building: their presence "disturbed the public peace or undermined public safety." (App. 898–99.) Again, though, that speaks to § 1752(a)(2)'s harm requirement—that "such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions . . . ."

Notably, it was § 1752(a)(2)'s harm element—not the element of disorderly or disruptive conduct—that the *Rivera* court was addressing

with its "analogy to 'raindrops in a flood'" that the district court adopted to find sufficient evidence of proscribed conduct. (App. 899 (quoting the analogy in holding that Mr. Alford's "presence was an aspect of the disorder and disruption of the Capitol on January 6"); *see also Rivera*, 607 F. Supp. 3d at 8 (using the analogy to explain why Mr. Rivera's conduct "*in fact* disrupt[ed] Congressional proceedings" as § 1752(a)(2) requires).)

The court in *Rivera* also held that mere presence in the Capitol on January 6 sufficed as proscribed conduct because it "is both (1) 'disorderly' in the sense that it furthers the mob's 'disturb[ing] the public peace' and (2) 'disruptive' insofar as it disturbs the normal and peaceful condition of the Capitol grounds and buildings, its official proceedings, and the safety of its lawful occupants." 607 F. Supp. 3d at 8. But that conclusion wasn't essential, because Mr. Rivera was not merely present. While in the Capitol Grounds and Building, he "recorded himself and recorded fellow rioters who tore through barricades, police lines, and broken windows and doors to gain access to the Capitol and halt Congressional proceedings." *Id.* at 3. And he "pushed [his] way through the [lines of] riot police." *Id.* So, as the district court noted in *Rivera*, even if mere presence was insufficient, "continued presence in a mob that is

33

being tear gassed and pepper sprayed is disorderly insofar as a person's continued presence clearly impedes law enforcement's efforts to regain control of a particular area." *Id.* at 8.

There was no equivalent evidence here. Mr. Alford was silently and passively present. When police told him to head for the exit, he did. He did not defy, or exhort others to defy, police and conspicuous barriers. He presented evidence that he did not know the Capitol Building was a restricted area, but there was sufficient evidence for a rational jury to infer that he did, so he does not challenge his conviction on Count One. Likewise, there was sufficient evidence for the jury to find that Mr. Alford "demonstrated" in the Capitol by joining the crowd inside, even if he didn't see it that way, so he does not challenge his conviction on Count Four. Even on Counts Two and Three, he does not dispute that the jury could infer that he intended to impede or disrupt Congress (even if he made no discernible effort to do so) and could find that Congress actually was disrupted by his presence alongside others.

There was insufficient evidence, however, that Mr. Alford engaged in any conduct that was disorderly or disruptive by its nature, as § 1752(a)(2) and § 5104(e)(2)(D) require. That element is separate from

34

the statutes' intent and harm elements, and it is not satisfied simply because the other elements are. "[J]ust . . . standing around, taking pictures" is not inherently disorderly or disruptive behavior (*cf.* Sent'g Tr. 36), and it is difficult to conceive—or find examples in case law—of another circumstance where evidence of mere presence would suffice to prove that a person's conduct was disorderly or disruptive. Nor does that evidence suffice here, because while Congress could have prohibited all conduct that intentionally disrupts proceedings at the Capitol, it did not. The government's theory of guilt on Counts Two and Three is a novel application of § 1752(a)(2) and § 5104(e)(2)(D) to conduct not previously brought within their sweep, and the district court erred in holding that evidence of mere presence was sufficient and denying Mr. Alford's Rule 29 motion.

## II. The district court abused its sentencing discretion by giving too much weight to the fact Mr. Alford went to trial and the exceptionally long imprisonment range prescribed by the Sentencing Guidelines, and too little weight to the need to avoid unwarranted disparities.

This is "the unusual case" where "[the] sentence is so unreasonably high . . . as to constitute an abuse of discretion by the district court." *Gardellini*, 545 F.3d at 1093. Many January 6 defendants have been

charged with the same four misdemeanors as Mr. Alford, and while his conduct on that day was unremarkable among those charged criminally, his sentence is remarkable. It is many times—6, 8, 12, even 26 times—longer than for others convicted of comparable conduct. Two factors caused that extreme disparity: Mr. Alford went to trial instead of pleading guilty, and Count Two subjected him to an inordinately harsh sentencing range under § 2A2.4 of the Sentencing Guidelines—the guideline for "Obstructing or Impeding Officers," though Mr. Alford did nothing of the sort. The district court unreasonably weighed 18 U.S.C. § 3553(a)'s sentencing considerations in concluding that those two factors warranted such a great disparity in outcomes, abusing its discretion by imposing a substantively unreasonable sentence.

## A.   Reasonableness review of a sentence under 18 U.S.C. § 3553(a).

A district court's duty at sentencing is defined by 18 U.S.C. § 3553(a), which instructs the court to impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in [subsection (a)(2)]," namely,

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

§ 3553(a)(2)(A)–(D).

Other subdivisions of § 3553(a) list additional matters a sentencing court must consider:

- "the nature and circumstances of the offense and the history and characteristics of the defendant," § 3553(a)(1);

- "the kinds of sentences available," § 3553(a)(3);

- "the kinds of sentence and the sentencing range established" by the Sentencing Guidelines, § 3553(a)(4);

- "any pertinent policy statement . . . issued by the Sentencing Commission[,] . . . subject to any amendments made to such policy statement by act of Congress," § 3553(a)(5);

- "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6); and

- "the need to provide restitution to any victims of the offense," § 3553(a)(7).

The sentencing court must "consider all of the § 3553(a) factors" and "make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 49–50. "In so doing, [the court] may not presume that the Guidelines range is reasonable," *id.* at 50 (citing *Rita v. United States*, 551 U.S. 338, 351 (2007)), though this Court may make that presumption in reviewing a sentence within the range, *Mattea*, 895 F.3d at 765.

**B.   There is a large disparity between Mr. Alford's sentence and those for other defendants with similar histories convicted of similar conduct.**

Mr. Alford's sentence is a true outlier among defendants convicted of offenses at the Capitol on January 6. Others who engaged in conduct comparable to his have received sentences many times shorter than his 12-month prison term. And others who have received sentences comparable to his were convicted of distinctly more serious crimes.

There is no way to comprehensively catalog the various sentences in a single, visually digestible form. According to the Department of Justice, "[a]pproximately 453 federal defendants have had their cases adjudicated and received sentences," of whom "[a]pproximately 237 have been sentenced to periods of incarceration." Press Release, U.S. Dep't of Just., 27 Months Since the Jan. 6 Attack on the Capitol (Apr. 6, 2023),

https://www.justice.gov/usao-dc/27-months-jan-6-attack-capitol. At least 57 of those custodial sentences were for felonies. *See id.* Rather than try to capture the full array of sentences and underlying conduct, this brief instead offers representative examples.

**1. Defendants convicted of conduct comparable to Mr. Alford's have received sentences many times shorter than his.**

As the DOJ's statistics demonstrate, many defendants convicted of January 6 offenses—nearly half of those sentenced as of early April 2023—have not received custodial sentences. But more than half have, including many who were convicted of misdemeanors. Most misdemeanor cases have the same basic facts: defendants unlawfully entered the Capitol while the Electoral College vote certification either was being conducted or was suspended because of the crowds inside the building. Unsurprisingly, many of the 200 or so defendants receiving no custodial sentence fit that basic fact pattern, with no additional, aggravated conduct.

But many misdemeanor cases have involved aggravating facts, such as

- going inside the Capitol after seeing police struggle to keep protesters from approaching or entering;[15]

- going inside after seeing that protesters forced entry through doors or windows;[16]

- going inside despite being teargassed or otherwise resisted by police;[17]

- exhorting others to enter, fight, or otherwise escalate the situation;[18]

- venturing beyond the Capitol's common areas into a staff office or a congressional chamber;[19] and

- destroying cell phone or social media evidence.[20]

None of those facts, nor any other aggravating facts, are present in Mr. Alford's case. His wide path around the south of the Capitol Grounds meant that he never got close to the clashes between protesters and police on the west side of the building. (*See, e.g.*, Def. Ex. 18b at 00:01:20–

---

[15] *See, e.g.*, Statement of Offense, *United States v. Jancart*, No. 1:21-cr-00148-JEB-1 (D.D.C. July 23, 2021), ECF No. 21.

[16] *See, e.g.*, Statement of Offense, *United States v. Scavo*, No. 1:21-cr-00254-RCL-1 (D.D.C. Sept. 8, 2021), ECF No. 33.

[17] *See, e.g.*, Statement of Offense, *United States v. Timbrook*, No. 1:21-cr-00361-TNM-1 (D.D.C. Feb. 9, 2022), ECF No. 34.

[18] *See, e.g.*, Statement of Offense, *United States v. Evans*, No. 1:21-CR-00225-DLF-1 (D.D.C. Mar. 10, 2022), ECF No. 33.

[19] *See, e.g.*, Statement of Offense, *United States v. Peterson*, No. 1:21-CR-00309-ABJ-1 (D.D.C. Sept. 8, 2021), ECF No. 22.

[20] *See, e.g.*, Statement of Offense, *United States v. Grace*, No. 1:21-CR-00492-JDM-1 (D.D.C. Apr. 8, 2022), ECF No. 31.

00:02:30.) The scene on the east side was quite different by the time he first approached the Capitol Building, and there were no clashes or teargas to see. (*Compare* Def. Ex. 39a at 00:02:45–00:03:15, *and* Def. Ex. 40a at 00:01:30–00:04:00 (both showing protesters removing barriers and rushing past police on east side before Mr. Alford arrived), *with* Def. Ex. 22d, *and* Def. Ex. 25b (both showing conditions while Mr. Alford was on east plaza).) He entered a door that had been pushed open from the inside, not breached from the outside by people around him. When FBI agents later interviewed him and asked to search his cell phone, he gave it to them and consented, three times, to let them make a digital copy of its contents. (App. 570–72.) And when he testified, although the district court described his testimony as "disingenuous" and "not . . . entirely candid," the court did not "believe[] . . . [he] told deliberate falsehoods" (Sent'g Tr. at 38–39) during his 4½ hours[21] on the witness stand.

His sentence, however, is nearly double *the sum* of the sentences imposed in the cases listed above.

- Mr. Jancart was sentenced to 45 days' imprisonment.[22]

---

[21] (*See* App. 905–1001, 1025–1105 (testimony, with start and recess times noted).)

[22] Judgment, *United States v. Jancart*, No. 1:21-cr-00148-JEB-1 (D.D.C. Oct. 1, 2021), ECF No. 33 at 2.

41

- Mr. Scavo was sentenced to 60 days' imprisonment.[23]

- Mr. Timbrook was sentenced to 14 days' intermittent confinement.[24]

- Mr. Evans was sentenced to 20 days' intermittent confinement.[25]

- Mr. Peterson was sentenced to 30 days' imprisonment.[26]

- Mr. Grace was sentenced to 21 days' imprisonment.[27]

Mr. Alford was sentenced to 365 days' imprisonment.

His counsel has been unable to find any other defendant who received a sentence as long or longer for January 6 misdemeanors. Those that come closest are still months shorter even though each case involved significant aggravating conduct:

- Michael Curzio (Case No. 1:21-cr-00041-CJN-2) was sentenced to 6 months for a conviction under § 5104(e)(2)(G);[28]

---

[23] Judgment, *United States v. Scavo*, No. 1:21-cr-00254-RCL-1 (D.D.C. Nov. 22, 2021), ECF No. 48 at 2.

[24] Dkt. Min. Entry May 20, 2022, *United States v. Timbrook*, No. 1:21-cr-00361-TNM-1.

[25] Judgment, *United States v. Evans*, No. 1:21-CR-00225-DLF-1 (D.D.C. Nov. 29, 2022), ECF No. 68 at 2.

[26] Judgment, *United States v. Peterson*, No. 1:21-CR-00309-ABJ-1 (D.D.C. Dec. 15, 2021), ECF No. 35 at 2.

[27] Judgment, *United States v. Grace*, No. 1:21-CR-00492-JDM-1 (D.D.C. July 13, 2022), ECF No. 41 at 2.

[28] Judgment, *United States v. Curzio*, No. 1:21-cr-00041-CJN-2 (D.D.C. July 14, 2021), ECF No. 73 at 2. Mr. Curzio went inside the Capitol Visitors Center and refused to leave even after he encountered a line of police who told him to do so. Statement of Offense, *United States v. Curzio*, No. 1:21-cr-00041-CJN-2 (D.D.C. July 14, 2021), ECF No. 71.

- Glen Mitchell Simon (Case No. 1:21-cr-00346-BAH-1) was sentenced to 8 months for a conviction under § 1752(a)(2);[29]

- Billy Knutson (Case No. 1:22-cr-00031-FYP-1) was sentenced to 6 months for a conviction under § 1752(a)(1);[30]

- Jesus Rivera (Case No. 1:21-cr-00060-CKK-1) was sentenced to 8 months for convictions under § 1752(a)(1) and (a)(2) and § 5104(e)(2)(D) and (e)(2)(G);[31] and

- Eric Cramer (Case No. 1:22-cr-00339-RDM-2) was sentenced to 8 months for a conviction under § 1752(a)(2).[32]

---

[29] Judgment, *United States v. Simon*, No. 1:21-cr-00346-BAH-1 (D.D.C. Aug. 12, 2022), ECF No. 69 at 2. Before entering the Capitol, Mr. Simon pushed a metal bike rack against a line of officers, and recorded videos in which he described seeing others force open a door and break through windows and boasted that officers were "terrified." Statement of Offense, *United States v. Simon*, No. 1:21-cr-00346-BAH-1 (D.D.C. Apr. 29, 2022), ECF No. 52. During the more than 40 minutes he spent inside, he actively resisted officers' efforts to clear the Capitol Rotunda and exhorted others to go with him toward "Congress." *Id.*

[30] Judgment, *United States v. Knutson*, No. 1:22-cr-00031-FYP-1 (D.D.C. Aug. 30, 2022), ECF No. 35 at 2. Mr. Knutson climbed through a broken window to enter the Capitol and later made rap videos in which he boasted of being a Proud Boy who was "ready for a civil war," and said, "If the price of freedom's blood then I'm down to pay the fee," and "You try to take away our rights we gonna greet you with guns." Statement of Offense, *United States v. Knutson*, No. 1:22-cr-00031-FYP-1 (D.D.C. Apr. 13, 2022), ECF No. 24 at 4.

[31] Judgment, *United States v. Rivera*, No. 1:21-cr-00060-CKK-1 (D.D.C. Nov. 10, 2022), ECF No. 82 at 3. Mr. Rivera was convicted after a bench trial; some facts of his case are discussed above. *See supra* pp. 33–34. According to the government's sentencing memorandum, Mr. Rivera also watched and filmed as protesters fought police on the west front, encouraged others to climb the walls of the Capitol, and entered the building through a broken window after watching others force open an exterior door. Gov't Sent'g Mem., *United States v. Rivera*, No. 1:21-cr-00060-CKK-1 (D.D.C. Oct. 17, 2022), ECF No. 69 at 2.

[32] Judgment, *United States v. Cramer*, No. 1:22-cr-00339-RDM-2 (D.D.C. Feb. 27, 2023), ECF No. 59 at 2. Mr. Cramer brought a baseball bat and gas mask to the Capitol, was in the midst of a scuffle between police and protesters, and took (and

Mr. Alford, for his mere presence in the Capitol and without comparable aggravating facts, received a sentence longer than any of theirs—apparently, the longest January 6 misdemeanor sentence to date.

### 2. Defendants who have received comparable sentences were convicted of more serious crimes and conduct.

The sentences that are most comparable to Mr. Alford's were not imposed for mere presence in the Capitol, but for felony offenses. His counsel has identified the following cases, in addition to Mr. Alford's, in which sentences of 12 to 14 months were imposed:

| Defendant | Case No. | Felony Conviction(s) | Prison Term |
|---|---|---|---|
| Ronnie Presley | 1:21-cr-00257-RDM-1 | 18 U.S.C. § 231(a)(3) | 12 months[33] |
| James Rahm, Jr., | 1:21-cr-00150-RJL-1 | 18 U.S.C. § 1512(c)(2) | 12 months[34] |
| John Andries | 1:21-cr-00093-RC-1 | 18 U.S.C. § 1512(c)(2) | 12 months and 1 day[35] |

---

kept) a baton from a police officer. Statement of Offense, *United States v. Cramer*, No. 1:22-cr-00339-RDM-2 (D.D.C. Oct. 25, 2022), ECF No. 37.

[33] Judgment, *United States v. Presley*, No. 1:21-cr-00257-RDM-1 (D.D.C. Dec. 1, 2022), ECF No. 56 at 2.

[34] Judgment, *United States v. Rahm*, No. 1:21-cr-00150-RJL-1 (D.D.C. Jan. 19, 2023), ECF No. 71 at 3.

[35] Judgment, *United States v. Andries*, No. 1:21-cr-00093-RC-1 (D.D.C. Jan. 18, 2023), ECF No. 76 at 2.

| Roger Baugh | 1:22-cr-00313-JEB-1 | 18 U.S.C. § 231(a)(3) | 12 months and 1 day[36] |
| Nolan Cooke | 1:22-cr-00052-RCL-1 | 18 U.S.C. § 231(a)(3) | 12 months and 1 day[37] |
| Moises Romero | 1:21-CR-00677-TSC-1 | 18 U.S.C. § 231(a)(3) | 12 months and 1 day[38] |
| Troy Sargent | 1:21-cr-00258-TFH-1 | 18 U.S.C. §§ 231(a)(3), 111(a)(1) | 14 months[39] |
| Troy Smocks | 1:21-cr-00198-TSC-1 | 18 U.S.C. § 875(c) | 14 months[40] |
| David Mehaffie | 1:21-cr-00040-TNM-7 | 18 U.S.C. §§ 111(a)(1) and 2; 18 U.S.C. § 231(a)(3) | 14 months[41] |

Each of the listed defendants was convicted of one or more of the following

felonies: assaulting, resisting, or impeding a federal officer, § 111(a)(1)

---

[36] Judgment, *United States v. Baugh*, No. 1:22-cr-00313-JEB-1 (D.D.C. Jan. 24, 2023), ECF No. 20 at 2.

[37] Judgment, *United States v. Cooke*, No. 1:22-cr-00052-RCL-1 (D.D.C. July 11, 2022), ECF No. 60 at 2.

[38] Judgment, *United States v. Romero*, No. 1:21-CR-00677-TSC-1 (D.D.C. Aug. 11, 2022), ECF No. 36 at 2.

[39] Judgment, *United States v. Sargent*, No. 1:21-cr-00258-TFH-1 (D.D.C. Dec. 14, 2022), ECF No. 74 at 3.

[40] Judgment, *United States v. Smocks*, No. 1:21-cr-00198-TSC-1 (D.D.C. Dec. 3, 2021), ECF No. 67 at 2.

[41] Judgment, *United States v. Mehaffie*, No. 1:21-cr-00040-TNM-7 (D.D.C. Mar. 9, 2023), ECF No. 575 at 3.

(Sargent and Mehaffie); obstructing, impeding, or interfering with an officer during a civil disorder, § 231(a)(3) (Presley, Baugh, Cooke, Romero, Sargent, and Mehaffie); interstate threat to kidnap or injure, § 875(c) (Smocks); and corruptly obstructing, influencing, or impeding an official proceeding, § 1512(c)(2) (Rahm and Andries).

Most of them likely will serve *less* time in prison than Mr. Alford. Approximately 15 percent of a sentence "of *more than* 1 year" may be satisfied by so-called "good-time credit," *see* 18 U.S.C. § 3624(b)(1)—so even a 14-month sentence can be served in just under a year.[42] Many other defendants convicted of felonies will serve significantly less, even without good-time credit. *See, e.g.*, Judgment, *United States v. Leffingwell*, No. 1:21-cr-00005-ABJ-1 (D.D.C. Feb. 18, 2022), ECF No. 51 at 2 (six-month sentence for conviction under § 111(a)(1)); Judgment, *United States v.*

---

[42] Specifically, § 3624(b)(1) provides for "credit toward the service of the prisoner's sentence, of up to 54 days for each year of the prisoner's sentence . . . ." It is common for federal inmates to receive full good-time credit, which reduces a year-and-a-day sentence by 54 days, and a 14-month sentence by 63 days. But because such credit is only available for "a term of imprisonment of more than 1 year," Mr. Alford is ineligible for it. Indeed, after the district court pronounced the sentence, his counsel asked the court to make it a year and a day for this reason; the government did not oppose the request; and the court initially agreed. (Sent'g Tr. at 46.) But after the government pointed out that such a term would require the sentences for different counts to be partially consecutive because of the one-year maximum for even the most serious offenses (Counts One and Two), the court reversed course and imposed the 12-month term it first pronounced.

*Fairchild*, No. 1:21-cr-00551-TFH-1 (D.D.C. Oct. 21, 2022), ECF No. 46 at 2 (six-month sentence for conviction under § 231(a)(3)); Judgment, *United States v. Young*, No. 1:21-cr-00617-DLF-1 (D.D.C. Feb. 7, 2023), ECF No. 38 at 3 (eight-month sentence for convictions under §§ 111(a)(1) and 231(a)(3)); Judgment, *United States v. Mostofsky*, No. 1:21-cr-00138-JEB-1 (D.D.C. May 6, 2022), ECF No. 110 at 3 (eight-month sentence for conviction under § 231(a)(3)); Judgment, *United States v. Michetti*, No. 1:21-cr-00232-CRC-1 (D.D.C. Sept. 8, 2022), ECF No. 54 at 2 (nine-month sentence for conviction under § 1512(c)(2)); Judgment, *United States v. Ryals*, No. 1:21-cr-00244-CKK-1 (D.D.C. Oct. 27, 2022), ECF No. 86 at 2 (nine-month sentence for conviction under § 231(a)(3)).

In short, Mr. Alford's sentence is significantly longer than for others who engaged in similar conduct, and even many who engaged in notably more serious conduct. He was sentenced like persons convicted of felonies. There is a striking disparity between his sentence and those given to defendants with similar records who were convicted of similar conduct.

## C.    The disparity is not warranted by Mr. Alford's going to trial or any other § 3553(a) factor.

Section 3553(a) disfavors sentencing disparities, instructing courts to "consider . . . the need to avoid unwarranted sentence disparities

among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6). The statute does not say that *all* such disparities should be avoided, only those that are "unwarranted," *id.* Here, the district court said any disparity was warranted because Mr. Alford went to trial and testified in his defense. The court acknowledged that Mr. Alford was exercising constitutionally protected rights and should not be punished for doing so, but it noted that by going to trial he lost out on the potential benefits of a plea bargain. (*See* Sent'g Tr. at 41–42.)

But that reasoning doesn't even *explain* the 12-month sentence, much less warrant the disparity. Instead, the evident explanation is that the court gave great weight to (1) the fact that Mr. Alford went to trial, or (2) the harsh and ill-fitting range prescribed by the Sentencing Guidelines, or (3) both. This Court's review is rightly deferential, but as the Eleventh Circuit has noted, "Looking at sentencing decisions through the prism of discretion is not the same thing as turning a blind eye to unreasonable ones." *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc). And while "[t]he fetters on a district court's sentencing discretion . . . are loosened by the substantial discretion [reviewing courts]

48

afford district courts in sentencing, at the boundaries of reasonableness the fetters do fetter." *Id.*

The Guidelines Manual's statutory index, U.S. Sent'g Guidelines Manual App. A (U.S. Sent'g Comm'n 2021), identifies two offense-conduct guidelines—U.S.S.G. §§ 2A2.4 and 2B2.3—for convictions under § 1752, *id.* at 567. Section 2A2.4 is entitled "Obstructing or Impeding Officers," and section 2B2.3, "Trespass." The Manual does not specify which subsections of § 1752 trigger each guideline, but Mr. Alford's § 1752(a)(1) conviction (Count One) neatly fits the trespass label for § 2B2.3, which prescribed an offense level of 6, *see* U.S.S.G. § 2B2.3(a), (b)(1)(A). His § 1752(a)(2) conviction for disorderly or disruptive conduct (Count Two), by contrast, doesn't neatly fit either "Obstructing or Impeding Officers" or "Trespass." But with those as the only two options, the Probation Office concluded that § 2A2.4 was the proper guideline (Doc.[43] 104 (Presentence Investigation Report ("PSR")) at ¶ 25), if only by default, and Mr. Alford agreed (App. 1342).

---

[43] "Doc." refers to numbered CM/ECF entries on the district court docket.

49

Section 2A2.4 is the offense-conduct guideline for common January 6 felonies like violations of §§ 111(a)(1)[44] and 231(a)(3),[45] and it prescribes an unenhanced base offense level of 10. U.S.S.G. § 2A2.4(a). (For comparison, the unenhanced base offense level for a conviction under 18 U.S.C. § 922(g)(1), possessing a firearm after a felony conviction, is 12. U.S.S.G. § 2K2.1(a)(7).) Mr. Alford's Guidelines range was significantly elevated because his conviction for disorderly or disruptive conduct subjected him to the guideline for obstructing or impeding officers, even though he didn't obstruct or impede officers.

His offense level was increased by two additional levels because his testimony triggered U.S.S.G. § 3C1.1's upward adjustment for obstructing or impeding the prosecution. (*See* PSR at ¶¶ 18, 18a.) The PSR stated that § 3C1.1 should apply because of Mr. Alford's testimony about his subjective states of mind—whether he traveled to D.C. principally to attend then-President Trump's rally *about* the Electoral College vote

---

[44] U.S. Sent'g Guidelines Manual App. A at 558 (U.S. Sent'g Comm'n 2021).

[45] The index of the Guidelines Manual does not list a guideline for § 231, but Guidelines calculations for § 231 convictions have employed § 2A2.4. *See, e.g.*, Plea Agreement, *United States v. Romero*, No. 1:21-cr-677-TSC (D.D.C. Mar. 16, 2022), ECF No. 24 at 2; Plea Agreement, *United States v. Cooke*, No. 1:22-cr-00052-RCL-1 (D.D.C. Mar. 9, 2022), ECF No. 47 at 2–3.

certification or instead because of the certification itself; whether he noticed when he entered the Capitol that a window in the Upper House Door was cracked; and how he felt about the broader events of January 6 after the fact. (*See id.* at ¶ 18.) Mr. Alford conceded this too was a correct application of the Guidelines but argued that its effect was out of proportion to its basis. (App. 1342–43.) Just as not all § 2A2.4 offenses are created equal, neither is all testimony that meets the letter of § 3C1.1. The district court illustrated the validity of that distinction in saying it didn't believe Mr. Alford had "testif[ied] . . . to deliberate falsehoods" (Sent'g Tr. 37)—which would have triggered the same two-level adjustment under § 3C1.1.

The result was a Guidelines imprisonment range of 10 to 16 months (PSR at ¶ 85), which—as he noted at sentencing (*see* App. 1343–44) and has discussed above, *see supra* pp. 38–47—treated him like defendants convicted of far more serious conduct, and *un*like those convicted of similar conduct. The district court noted that argument but rejected the comparisons to other cases, pointing out that Mr. Alford "chose to go to trial . . . [a]nd he chose to testify . . . ." (Sent'g Tr. at 41–42.) And while the court insisted it was not punishing him for doing so, it is difficult to

see what else could explain the decision that his sentence should be many times what others received after pleading guilty to equivalent conduct. Certainly, it is hard to say that the disparity is proportionate to the district court's conclusion that his testimony "was [not] entirely candid," "was disingenuous," and "showed a lack of awareness for the seriousness and gravity of what happened that day," which the court cited as its main takeaway from the trial. (*Id.* at 38–39.)

Instead, the formula for the disparity seems straightforward: the applicable Sentencing Guidelines were calibrated to more serious offense conduct (§ 2A2.4) and obstructive testimony (§ 3C1.1). They were "the starting point and the initial benchmark" in the district court's sentencing calculus, *Gall*, 552 U.S. at 49, and the court gave them—and, apparently, the fact that Mr. Alford went to trial—more weight than those considerations reasonably deserved. And it gave too little weight to a countervailing consideration, the need to avoid unwarranted sentencing disparities. "A district court abuses its discretion when it . . . commits a clear error of judgment in considering the [§ 3553(a)] factors," *Irey*, 612 F.3d at 1189 (quoting *United States v. Campa*, 459 F.3d 1121, 1174 (11th Cir. 2006) (en banc)), which happens when a court "considers the proper

52

factors but balances them unreasonably" *id*. That happened here, and it produced a substantively unreasonable sentence.

## CONCLUSION

Mr. Alford asks the Court to vacate the sentence and his convictions on Counts Two and Three, and to remand to the district court for resentencing on Counts One and Four.

In the alternative, if the Court affirms Mr. Alford's convictions, he asks the Court to vacate his sentence as substantively unreasonable and remand for the district court to impose a reasonable sentence.

Respectfully submitted,

KEVIN L. BUTLER
Federal Public Defender
Northern District of Alabama

/s/ DEANNA LEE OSWALD
Assistant Federal Public Defender
Deanna_Oswald@fd.org

/s/ TOBIE J. SMITH
Appellate Attorney

Office of the Federal Public Defender
Northern District of Alabama
505 20th Street North, Suite 1425
Birmingham, Alabama 35203
205-208-7170
Tobie_Smith@fd.org

## CERTIFICATE OF COMPLIANCE

Counsel for Russell Dean Alford certifies under Fed. R. App. P. 32(g) that this brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the brief contains 10,972 countable words. Century Schoolbook 14 is the style and type size used in this brief.

/s/ TOBIE J. SMITH
Appellate Attorney
Office of the Federal Public Defender
Northern District of Alabama

54

## CERTIFICATE OF SERVICE

I certify that on Friday, April 21, 2023, the foregoing brief was filed electronically using this Court's CM/ECF system, which will provide notice of filing to all counsel of record. A true and correct copy was also served by either first-class United States mail or Federal Express overnight delivery, postage prepaid, to the Defendant-Appellant, Russell Dean Alford, at his home address, which is on file with the district court.

On this same date, the original and additional copies of the foregoing brief were filed by Federal Express overnight delivery, postage prepaid, addressed as follows:

Clerk's Office—Appeal No. 23-3023
U.S. Court of Appeals for the D.C. Circuit
E. Barrett Prettyman U.S. Courthouse
333 Constitution Ave., NW
Washington, DC 20001

/s/ TOBIE J. SMITH
Appellate Attorney
Office of the Federal Public Defender
Northern District of Alabama

55