ORAL ARGUMENT NOT YET SCHEDULED

BRIEF FOR APPELLEE

———————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

No. 23-3023

———————————————

UNITED STATES OF AMERICA,                         Appellee,

    v.

RUSSELL DEAN ALFORD,                         Appellant.

———————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————

> MATTHEW M. GRAVES
> United States Attorney
>
> CHRISELLEN R. KOLB
> ELIZABETH H. DANELLO
> MICHAEL J. ROMANO
> JAMES D. PETERSON
> * ERIC HANSFORD
> D.C. Bar #1017785
> Assistant United States Attorneys
> * Counsel for Oral Argument
> 601 D Street, NW, Room 6.232
> Washington, D.C. 20530
> Eric.Hansford@usdoj.gov
> (202) 252-6829

Cr. No. 21-263 (TSC)

# Certificate of Parties, Rulings, and Related Cases

Pursuant to D.C. Circuit Rule 28(a)(1), appellee hereby states as follows:

## Parties and Amici

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the brief for appellant.

## Rulings Under Review

References to the ruling at issue appear in the brief for appellant.

## Related Cases

This case has not previously been before this Court. There is at least one other case pending before this Court raising similar sufficiency-of-the-evidence arguments to Issue I listed below: *United States v. Jesus D. Rivera*, No. 22-3088.

## STATUTES AND REGULATIONS

Pursuant to D.C. Circuit Rule 28(a)(5), appellee states that all pertinent statutes and regulations are contained in the attached Addendum.

# Table of Contents

Introduction .................................................................. 1

Counterstatement of the Case.......................................... 2

   The Trial .................................................................3

      The Government's Evidence .......................................3

      The Defense Evidence...............................................12

Summary of Argument.....................................................16

Argument ...................................................................18

I.   Sufficient Evidence Established that Alford Engaged in Disorderly or Disruptive Conduct Under § 1752(a) and § 5104(e)(2)(D)...................................................18

   A.   Statutes at Issue and Standard of Review........................18

   B.   Statutory and Legislative History......................................20

      1.   Section 5104 ................................................20

      2.   Section 1752 ................................................23

   C.   The Plain Meanings of "Disruptive Conduct" and "Disorderly Conduct" ........................................................25

      1.   "Disruptive Conduct" ...................................25

      2.   "Disorderly Conduct" ...................................28

   D.   Statutory Context Does Not Displace the Plain Meanings of "Disruptive Conduct" and "Disorderly Conduct".........................................................................33

   E.   Sufficient Evidence Established that Alford Engaged in "Disruptive Conduct" and "Disorderly Conduct" ..........42

II.  Alford's  In-Guidelines  Sentence  Was  Substantively
     Reasonable. ........................................................................ 50

     A.  Additional Background ..................................................... 50

     B.  Applicable Legal Principles and Standard of Review ........ 54

     C.  Alford's Sentence Was Reasonable ................................... 55

CONCLUSION ............................................................................ 61

iv

# Table of Authorities*

**Cases**

*Advoc. Health Care Network v. Stapleton*, 581 U.S. 468 (2017)............35

*Ali v. Fed. Bureau of Prisons*, 552 U.S. 214 (2008)..........................39, 40

*Bynum v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50 (D.D.C. 2000)......44

\* *Cantwell v. Connecticut*, 310 U.S. 296 (1940)............................30, 32, 46

*City of Chicago v. Wender*, 262 N.E.2d 470 (Ill. 1970) ...........................31

*Collins v. City of Norfolk*, 41 S.E.2d 448 (Va. 1947)...............................31

*Feeley v. District of Columbia*, 387 F.2d 216 (D.C. Cir. 1967)..........20, 21

*Feiner v. New York*, 340 U.S. 315 (1951) .........................................31, 32

*Gall v. United States*, 552 U.S. 38 (2007) ...................................54, 56, 57

*Garner v. Louisiana*, 368 U.S. 157 (1961) ...............................................33

*Graham Cnty. Soil & Water Conservation Dist. v. United States
    ex rel. Wilson*, 559 U.S. 280 (2010) .......................................................40

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ..................................27

*Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768 (2020)............25

*Jackson v. Virginia*, 443 U.S. 307 (1979)................................................19

*Jeannette Rankin Brigade v. Chief of Capitol Police*,
    342 F. Supp. 575 (D.D.C.), *aff'd*, 409 U.S. 972 (1972).........................48

---

\* Authorities upon which we chiefly rely are marked with asterisks.

*Lederman v. United States*, 291 F.3d 36 (D.C. Cir. 2002). ................... 48

*McDonnell v. United States*, 579 U.S. 550 (2016) ................................. 39

*Morissette v. United States*, 342 U.S. 246 (1952) ................................. 34

*Morrison v. State*, 237 S.W.2d 548 (Tenn. 1951) .................................. 31

*People v. Munafo*, 406 N.E.2d 780 (N.Y. 1980) .................................... 31

*Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873 (2019) ................... 36

*Rita v. United States*, 551 U.S. 338 (2007) ........................................... 56

*Rodgers v. United States*, 290 A.2d 395 (D.C. 1972) ........................... 31

*S.D. Warren Co. v. Maine Bd. of Env't Prot.*, 547 U.S. 370 (2006) ......... 40

*Sekhar v. United States*, 570 U.S. 729 (2013) ...................................... 28

*Smith v. District of Columbia*, 387 F.2d 233 (D.C. Cir. 1967) .... 20, 21, 22

*Smith-Caronia v. United States*, 714 A.2d 764 (D.C. 1998) .................. 44

*State v. Ferreira*, 709 P.2d 607 (Haw. 1985) ....................................... 29

*State v. Maker*, 180 N.W.2d 707 (Wis. 1970) ...................................... 31

*State v. Reynolds*, 66 N.W.2d 886 (Minn. 1954) .................................. 31

*Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783 (2022) ............................... 38

*Thompson v. City of Louisville*, 362 U.S. 199 (1960) ............................ 33

*United States v. Baldwin*, 745 F.3d 1027 (10th Cir. 2014) ................... 41

*United States v. Boyd*, 803 F.3d 690 (D.C. Cir. 2015) ........................... 19

*United States v. Bridgeman*, 523 F.2d 1099 (D.C. Cir. 1975) .......... 33, 47

\* *United States v. Bronstein*, 849 F.3d 1101 (D.C. Cir. 2017) .. 27-28, 34, 37

*United States v. Clark*, 184 F.3d 858 (D.C. Cir. 1999) ........................... 20

*United States v. Fischer*, 64 F.4th 329 (D.C. Cir. 2023) ................... 38, 39

*United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) ................. 58

*United States v. Grider*, No. CR 21-022 (CKK), 2022
    WL 17829149 (D.D.C. Dec. 21, 2022) .................................................. 46

*United States v. Griffith*, No. CR 21-244-2 (CKK), 2023
    WL 3477249 (D.D.C. May 16, 2023) ..................................................... 44

*United States v. Knight*, 824 F.3d 1105 (D.C. Cir. 2016) ....................... 55

*United States v. Kokinda*, 497 U.S. 720 (1990) ...................................... 28

*United States v. Lopesierra-Gutierrez*, 708 F.3d 193 (D.C. Cir. 2013) ... 59

\* *United States v. Otunyo*, 63 F.4th 948 (D.C. Cir. 2023) ........................ 56

*United States v. Parks*, 995 F.3d 241 (D.C. Cir. 2021) ..................... 54, 55

*United States v. Reynoso*, 38 F.4th 1083 (D.C. Cir. 2022) ...................... 19

\* *United States v. Rivera*, 607 F. Supp. 3d 1 (D.D.C. 2022) ............... 43, 46

*United States v. Woodard*, 376 F.2d 136 (7th Cir. 1967) ........................ 31

*Wash. Mobilization Comm. v. Cullinane*, 566 F.2d 107
    (D.C. Cir. 1977) ..................................................................................... 33

*Williams v. District of Columbia*, 419 F.2d 638 (D.C. Cir. 1969)
    (en banc) .................................................................................................. 31

## Other Authorities

18 U.S.C. § 111(a)(1)..............................................................59

18 U.S.C. § 1752 ...........................................................38, 40

18 U.S.C. § 1752(a)(1).............................................................2

18 U.S.C. § 1752(a)(2)........................................... 2, 38, 47, 60

18 U.S.C. § 1752(c) ...............................................................18

18 U.S.C. § 3553(a)........................................................54, 55

18 U.S.C. § 3553(a)(1)...........................................................58

18 U.S.C. § 3553(a)(2)...........................................................58

18 U.S.C. § 3553(a)(4)...........................................................58

18 U.S.C. § 3553(a)(6)...........................................................57

27 C.J.S. *Disorderly Conduct* (May 2023 update) .......... 29, 30, 31, 33, 36

40 U.S.C. § 193f(b).................................................................20

40 U.S.C. § 5104(e)(2)...........................................................24

40 U.S.C. § 5104(e)(2)(D)................................................ 2, 19, 37

40 U.S.C. § 5104(e)(2)(G)........................................................2

41 C.F.R. § 102-74.390 ...........................................................41

Act of Oct. 14, 1982, Pub. L. No. 97-308, 96 Stat 1451 ...........................24

Act of Oct. 20, 1967, Pub. L. No. 90-108, 81 Stat. 275 ...........................20

*American Heritage Dictionary of the English Language* (1969). 26, 29, 47

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ............................................... 38, 39

*Black's Law Dictionary* (11th ed. 2019) ............................... 28, 30, 32, 47

*Black's Law Dictionary* (5th ed. 1979) .................................................... 30

*Black's Law Dictionary* (rev. 4th ed. 1968)................................ 28, 41, 47

D.C. Cir. Courthouse Decorum Policy (Dec. 13, 2022) .......................... 41

D.C. Code § 22-3111 ................................................................................ 22

Edward M. Dangel, *Contempt* § 1 (1939) ............................................... 26

Fed. R. Crim. P. 15(c)(1)(B) ..................................................................... 41

Fed. R. Crim. P. 43(c)(1)(C) ..................................................................... 41

Federal Restricted Buildings and Grounds Improvement Act of 2011, Pub. L. No. 112-98, 126 Stat. 263 (2012)............................... 24

Francis Barry McCarthy, Vagrancy and Disorderly Conduct, *in* 4 *Encyclopedia of Crime and Justice* 1589 (Sanford H. Kadish ed., 1983) ..................................................................... 32

H.R. Rep. No. 112-9 (2011)...................................................................... 24

H.R. Rep. No. 90-745 (1967)...................................................... 20, 22, 23

H.R. Rep. No. 91-1768 (1970)................................................................. 24

H.R. Rep. No. 97-451 (1982).................................................................... 24

M. Bassiouni, *Substantive Criminal Law* (1978) ................................... 29

*Model Penal Code* (Official Draft and Revised Commentaries
  1980).................................................................... 29, 30, 32, 36, 41, 42

Omnibus Crime Control Act of 1970, Pub. L. No. 91-644,
  84 Stat. 1880 (1971) .............................................. 23, 24, 47

Revision of Title 40, Pub. L. No. 107-217, 116 Stat. 1062 (2002)........... 23

S. Rep. No. 90-573 ..................................................... 21, 22, 23

*Security of the Capitol Buildings: Hearing on S. 2310 Before
  the Subcomm. on Pub. Bldgs. & Grounds of the S. Comm.
  on Pub. Works*, 90th Cong. 29 (1967) ..................................... 21, 22, 35

*The Random House Dictionary of the English Language: The
  Unabridged Edition* (1971)................................................ 26

U.S.S.G. § 2A2.4 ....................................................... 50, 59

U.S.S.G. § 3C1.1 .................................................. 50, 51, 57, 59, 60

U.S.S.G. § 3E1.1 ....................................................... 50, 59

U.S.S.G. ch. 5, pt. A................................................... 57

*Webster's Third New International Dictionary* (1966)............... 25, 26, 29

*Wharton's Criminal Law* (16th ed. Sept. 2022 update)........................ 29

William Blackstone, *Commentaries*................................... 29, 32

x

# ISSUES PRESENTED

I.    Whether sufficient evidence supported Alford's convictions for engaging in "disorderly or disruptive conduct," when he joined the mob occupying the hallway outside of the floor of the House of Representatives on January 6, 2021, and his presence there prevented Congress from resuming the electoral certification.

II.    Whether Alford's within-Guidelines sentence was substantively reasonable, where the district court explained Alford was not similarly situated to other January 6 misdemeanants for multiple reasons, including that Alford had testified falsely.

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————————

No. 23-3023

————————————————

UNITED STATES OF AMERICA,                    Appellee,

v.

RUSSELL DEAN ALFORD,                    Appellant.

————————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

————————————————

BRIEF FOR APPELLEE

————————————————

## INTRODUCTION

On January 6, 2021, appellant Russell Alford illegally entered the
U.S. Capitol building and joined the mob inside. He and other rioters
occupied the hallway just outside the House floor, as Representatives
sheltered inside. While inside the Capitol, Alford also set off a metal-
detector alarm, tried to open a locked door to the outside, and disregarded
police commands to leave. By joining the occupying mob, Alford engaged

in "disorderly or disruptive conduct." Indeed, his entry into the building alone was disruptive, as Congress could not resume its electoral certification as long as a single unscreened person—including Alford—remained inside. And his resulting 12-month sentence for his crimes was substantively reasonable, falling in the lower half of the undisputed Guidelines range. Alford's convictions and sentence should be affirmed.

## COUNTERSTATEMENT OF THE CASE

After the January 6, 2021, attack on the United States Capitol, Alford was charged by criminal information with Entering and Remaining in a Restricted Building (Count 1) (18 U.S.C. § 1752(a)(1)); Disorderly and Disruptive Conduct in a Restricted Building (Count 2) (18 U.S.C. § 1752(a)(2)); Violent Entry and Disorderly Conduct in a Capitol Building (Count 3) (40 U.S.C. § 5104(e)(2)(D)); and Parading, Demonstrating, or Picketing in a Capitol Building (Count 4) (40 U.S.C. § 5104(e)(2)(G)) (Appendix (A) 23-24). Following a six-day jury trial before the Honorable Tanya S. Chutkan, Alford was convicted on all four charges (A15-16; A37; A1294-96). On February 2, 2023, Judge Chutkan concurrently sentenced Alford to 12 months of imprisonment for Counts 1 and 2, and six months of imprisonment for Counts 3 and 4, followed by

12 months of supervised release (Supplemental Appendix (SA) 42-45; A1358-64). Alford timely appealed on February 14 (A1366).

## The Trial

### *The Government's Evidence*

#### *The January 6, 2021, Attack on the Capitol*

On January 6, 2021, the Capitol building was closed to the public for two reasons. First, the building had been closed since March 2020 due to the spread of COVID-19 (A321; A324-25). Second, the building was secured that day because then-Vice President Pence (who was protected by the Secret Service) had come to the Capitol to oversee the certification of the 2020 presidential election, which would result in President Biden being certified the winner (A320-21; A325-328). In preparation for the January 6 certification vote, the U.S. Capitol Police established a protective perimeter on the Capitol grounds, including interconnected bicycle racks, mesh "snow fencing," and signs posted at regular intervals reading "Area Closed" (A326-27; A334-38; A341-43; see Government Exhibits in Supplemental Appendix (GE) 401-404). Everything inside the barricades (including the entire Capitol building) was restricted, with members of the public prohibited inside (*id.*).

Even when the Capitol is open to the public, visitors generally may enter only through the visitor center (A328-31). And any entering visitor will have to undergo security screenings similar to those at an airport, including either passing through a walk-through metal detector (a magnetometer) or being individually searched (A330-31).

On January 6, as summarized in Government Exhibit 100 (see A344-72; A670-77), a mob of rioters overran police lines, smashed through barricades, and broke open doors and windows to force its way into the Capitol building. Members of the mob occupied space inside the building, forcing Congress to stop its work. The mob first breached a police security line outside and entered the restricted area at the Peace Circle at 12:54 p.m. The mob occupied the Capitol's West Front, tearing down fencing. At 2:12 p.m., rioters first made entry into the building by breaking windows near the Senate Wing Door. Shortly after this, rioters breached multiple other entrances into the building.

While the mob massed outside the Capitol, as summarized in Government Exhibit 101 (see A365-75), the Joint Session of Congress assembled for the count of the Electoral College votes at 1:00 p.m. with Vice President Pence presiding. After the mob breached the building, the

Senate and House recessed for the safety of Members, and Members were evacuated. Over the next several hours, officers sought to reclaim the Capitol building from the mob. Some rioters violently resisted police efforts to clear the building. The certification proceedings did not resume until 8:00 p.m., after all rioters had been removed from the Capitol and the building had been searched and secured (A692-95). Because none of the rioters had undergone security screenings, proceedings could not resume until every single rioter was out of the building (A380-82).

*Alford's Statements and Actions Before January 6*

Five days after the 2020 election, on November 8, Alford predicted on Facebook that the election would be decided by Congress in January, citing the Twelfth Amendment (A764-66; GE302). On November 15, Alford shared a post reading, "Anyone who thinks I Am going to Comply with Communism, just because you Voted for it Is in For a Rude Awakening" (A766-67; GE303).

As January 6 approached, his posts included increasingly violent references. On November 22, Alford posted a picture of a bullet, captioned: "By Bullet or Ballot Restoration Of The Republic Is Coming!" (A768-69; GE306). On December 31, he shared a message from one of the

5

former President's lawyers: "Each citizen must now make a decision. Will you sit quietly & allow Communists & Globalists to control every aspect of your lives? Or will you stand tall & #FightBack for your freedom?" (A775-76; GE317.) On January 3, 2021, he shared: "When they rigged the elections they declared war on the American people" (A776-77; GE318). And late at night on January 4, Alford posted a trio of messages: an image of an enormous crowd, captioned "We concede nothing! #RiggedElection"; a picture of the former President and select advisors, warning "You can run, but you cannot hide. The day of reckoning is NOW!"; and text reading, "The Constitution Actually says you Can legally Overthrow your Government if they Are tyrannical" (A779-82; A743-44; GE322-324).

Alford had been posting and messaging others about a road trip "to DC on the 6th" since December (A769-79). He had also RSVP'd "attending" to a Facebook event called "Stop The Steal Jan 6 Capitol Hill," to be held at the U.S. Capitol (A761-63; GE301). His events feed also included an event called "Storm the steps of government," though he had not replied to that invitation (*id*.).

6

*Alford's Conduct on January 6*

Alford and a friend drove from Hokes Bluff, Alabama, to Washington, D.C., where they rented a hotel room (A551-54). Alford attended the former President's rally on January 6 (A554). At the conclusion of the rally, the crowd—including Alford—began to walk towards the U.S. Capitol (A554-55).

Alford approached from the southwest, entering the restricted area near the Garfield Circle (see GE203; GE214; A784-85). He headed toward the East side of the Capitol building, walking past "Area Closed" signs and bicycle-rack barricades, navigating through breaches in the barriers, and passing vehicles with their emergency-lights activated (A382-93; A537-39; A546-48; Defense Exhibit in Supplemental Appendix (DE) 17c; DE19c; DE20c). En route, he walked by the chaos at the West Plaza, where he would have heard the overwhelming sound of the crowd and smelled tear gas in the air (A386-90; A819-20).

At 2:09 p.m., Alford walked past the House stairs leading up to the Upper House Door (A393-96; DE21c)—an entrance normally reserved for Members of Congress (A364; A677-80), where Alford would later enter the Capitol building. At that time, a noticeable line of approximately 22

7

officers stood on the stairs, protecting the Upper House Door (*id.*). Alford proceeded to the front of the East Rotunda Door area, watching the tumult at that location (A396-97; A442-46; A315; A786; GE204; DE22e).

Thirty minutes later, Alford returned to the Upper House Door area (A509-10). Officers were no longer visible on the stairs, though additional law-enforcement vehicles had moved in front of the staircase (A395-99; A686-87; DE21c; DE25c). Alford climbed the stairs, reaching a landing outside the Upper House Door at 2:40 (A744-48). As he stood there, others on the landing got the attention of rioters inside the building, who forced open one side of double-doors constituting the Upper House Door at 2:42, triggering a "high-pitched, screeching alarm" above the door that remained active throughout Alford's time in the building (A364-65; A375-79; A513-14; A680-84; A702-03; A735-37; A745-48; A1245-46; GE103 at 2:41:45-2:42:15). The breach also seemed to break the door's glass (*id.*). As Alford stood on the landing, moments after the breach, he posted a photo of rioters by the East Rotunda Door, captioned "Patriots" (A785-86; A818-20; GE319). Alford then joined the rioters streaming inside, entering the Capitol building through the Upper House Door at 2:43 (A317; A375-79; A515-16; A746; GE102; GE103; GE104; GE601).

Upon entering, Alford looked up above the door where the alarm was sounding and tried (without success) to open the closed half of the double-door (A377; A521; A684; A737-38; GE103 at 2:43:05-:11). He then passed through the metal detector, setting off that alarm (A377-78; A684-85; GE103 at 2:43:11-:20). The Upper House Door where Alford entered stood directly across from the Republican Door, which allowed direct access to the House floor (A363-67; A379; A687-88). At that moment, at least 50 House Members were sheltering on the other side of the Republican Door (A363-67; A379).

Alford remained inside the Capitol building for approximately 13 minutes (see GE104; GE105; GE106). While there, he filmed other rioters chanting "stop the steal," banging on the locked Republican Door, and even trying to break open the Republican Door (A696-97; A725-26; A787-88; GE205). The alarms were clearly audible in Alford's recordings (*id.*). In a nearby hallway, another rioter was shot and killed by the police, causing increasing unrest among the rioters, which Alford also filmed (see A691-92; A787-89; GE206; GE207; GE208).

A Capitol Police officer who had been in that hallway explained that, as long as a single unauthorized person remained there, Congress

could not resume its work, because none of the rioters had been screened for weapons or undergone identity checks (A692-94). In addition, while not every rioter was violent, the sheer size of the crowd made it difficult to deal with those rioters who did commit violence (A693).

Alford and other rioters were expelled by the D.C. Metropolitan Police Department's Civil Disturbance Unit, which arrived in the hallway around 2:52 (see A315; GE108; GE109; GE110; GE111; GE112; GE113). Feet away from Alford, MPD officers commanded rioters to leave through their words, through their gestures, and by physically moving rioters towards the door (see GE108 at 14:53:20-:50; GE109 at 14:53:20-:50; GE110 at 14:53:20-:50). Yet Alford instead turned and walked deeper into the building, away from the exit (A595-97; GE109 at 14:53:30-:45; GE110 at 14:53:30-:45).

Alford could not go far, however, because police had formed a line at the end of the hallway and were pushing rioters toward the exit (see A597-600, A618-19, A664-65; GE113 at 14:53:00-:55:00). So he followed the crowd towards the doors (A599; GE110 at 14:53:56-14:54:02). But as Alford approached the exit, instead of going through the open single door, he maneuvered to stand next to the adjacent closed door, under the

breached door's loud alarm, thus remaining inside the Capitol building (see A699-710; A748-55; GE106 at 2:54:00-2:56:50; GE106a at 2:54:00-:20; GE111 at 4:00-6:25; GE112; GE209; GE210). He stood there for more than two minutes, watching and filming as more than 50 other rioters walked past him to exit, making no effort to leave himself (*id.*). Alford left the building only after the second door opened at 2:56, as the final (and most unruly) rioters were being forcibly ejected (*id.*).

Soon after leaving the Capitol building, Alford posted one of the videos he had shot inside the hallway following the chaos of the shooting, titled: "Inside Capitol building as girl murdered" (A558-59; A790; GE335). He also posted a picture he had taken after leaving the building of two signs just off Capitol grounds, one showing a skull with "STOP THE STEAL 20 20," and the other reading, "OFF WITH THEIR HEADS—STOP THE STEAL" (A790-91; GE319; GE213; GE216).

*Alford's Statements After January 6*

In the days after January 6, Alford celebrated the riot. In the early morning hours of January 7, he posted a quote from the movie *V for Vendetta*, which is about a plot to overthrow the government of Great Britain: "People should not be afraid of their governments. Governments

11

should be afraid of their people." (A792-94; GE327.) At the same time, he mocked officers who dealt with the rioters, likening them to a fleeing mall cop (A793-94; GE328). On January 10, he celebrated the rioter's supposed righteousness: "We stormed the capitol looking for justice" (A794-95; GE330). On January 15, he posted a photo he had taken inside the Capitol, titled "Donald J Trump vs The World" (A795; GE331).

In speaking with FBI agents on January 20, Alford acknowledged that he entered the Capitol building through a door that had been "broken open" (A555; A576; A581-82). He also told agents that he "could smell a faint odor of tear gas, but it didn't negatively affect him" (A557). And he admitted to seeing a blood trail outside of the Capitol building, though he deemed it "fake blood" (A559-60; see GE211; GE212).

### *The Defense Evidence*

Alford testified that he drove from Alabama on January 5 "to see D.C.," "to be around like-minded people," and "to attend a Trump rally," claiming that he "thought that that [rally] would probably be the last one, since he was not elected as our president" (A907-08; A911; A1032-33). He knew that Congress was meeting to certify the election—indeed, that was the reason for the rally (A912; A957; A1037-38). And he "hope[d]" that

the former President would "be allowed to remain in office" and that "somebody would just do the right thing," though he "w[as]n't super optimistic" (*id.*). In Facebook messages from November 2020, Alford had equated the supposed election "fraud" to an ongoing "civil war" (A1066-67; GE307).

On January 6, after a winding route, Alford ended up near the Washington Monument, where he could see neither the stage in the Ellipse where the former President spoke nor the screens broadcasting the rally (A915-24). He testified that he "drove 800 miles to attend a rally and didn't care about hearing the speakers" (A1035). Instead, Alford spent most of the rally "socializing" (A924-25). He added that, in making the trip, he had "wanted to get out of [his] town and spend a weekend somewhere else"—though the rally was held on a Wednesday, and the trip forced him to close his auto body shop (A1035-36).

After the rally ended, Alford followed the crowds toward the Capitol, walking along Independence Avenue, past the Garfield Circle, around the south side of the Capitol, and eventually up to the Upper House Door landing (A925-61; A1045-46).

Alford claimed not to know that he was not allowed in the Capitol, and he testified that had he known that, he would not have gone inside (A906; A972; A1000). He also claimed largely not to notice (or at least not to understand) any bicycle racks, signs, empty fence posts, or other indications that the Capitol grounds were restricted (A925-61; A1045-46). He denied seeing the Upper House Door forced open (A960-65). And he claimed to see no indications as he walked through the door that he was not allowed inside (A971-72), though he gave conflicting answers on whether he could hear the alarm (A971; A1061; A1094-97).

Upon entering the Capitol building, Alford said, he was "[j]ust kind of wandering around, being a sightseer in D.C.," examining "the grandeur, the architecture, the detail, the craftsmanship" (A972). The Republican Door drew Alford's interest, he testified, not because of the protestors pounding on it, but because of "the burl wood, or whatever kind of wood that was" (A974).

Alford testified that, if ordered to leave by police, he would have done so (A978-80). When he turned away from the police instead of moving toward the door with the other rioters, Alford said, he was simply "[l]ooking for a different exit" and was "lost" (A981-85; A1050-51). He

denied having seen or heard the police at that point ordering other rioters to leave (A978-80; A1049-50). Once forced back toward the Upper House Door, Alford testified that he went to the closed half of the door—instead of exiting through the open half—because he was "trying to stay out of the crowd, waiting my turn" and "[t]ry[ing] to be orderly" (A985-88; A1052-53).

Alford denied seeing violence while he was at the Capitol, and he criticized the "knuckleheads" who had acted violently, saying, "There was no reason for all that. . . . I've lived through other presidents that I didn't agree with, and I was planning on the same thing." (A954-57.) Alford testified that, after watching the news at his hotel on the evening of January 6 and seeing "all the stupid happenings from the whole day," he had decided to go straight home (A995-96).

But before heading home, he admitted, he had posted a comment on Facebook making fun of police officers near the Capitol who had retreated from rioters, because he thought it was "funny" (A1070-74). He also posted that January 6 "was staged to keep Congress an[d] the rest of the mafia that is our Government out of GITMO" (A1079-81; GE326). On January 8, Alford shared a post claiming that the riot was "a

15

BRILLIANT TRUMP/MILITARY STING OPERATION" and that "Pence put his own NECK INTO THE NOOSE" (GE329; A1083-87). Even at trial, Alford maintained that some of what happened at the Capitol was done by "antifa or Black Lives Matter people" (A997-98).

## SUMMARY OF ARGUMENT

Sufficient evidence supports Alford's convictions for engaging in "disorderly or disruptive conduct" in Counts 2 and 3. "Disorderly or disruptive conduct" captures behavior that tends to disturb the public peace or interrupt governmental proceedings. Rather than outlawing a prescribed set of actions, the statutes focus on the likely results of the conduct, prohibiting any conduct tending to disturb or interrupt. That inquiry necessarily depends on the full surrounding circumstances, defying Alford's attempts to limit the statute to "inherently" disorderly or disruptive conduct. Nor do Alford's gambits to narrow the terms' plain meaning with canons of statutory interpretation withstand scrutiny. Rather, the statutes broadly and sensibly prohibit conduct tending to disrupt Congress or disturb its orderly process.

A jury could easily find that Alford's conduct on January 6 met that statutory standard. He breached the U.S. Capitol building without

16

authorization, setting off the alarm on the metal detector as he entered, and then joined the mob that had temporarily seized control of the building. Those actions alone disrupted Congress and disturbed its orderly process—indeed, as long as he was in the building, Congress could not resume its electoral certification. Even if Alford himself never chanted or banged on the doors to the House floor, he grew the mob's forces by joining its ranks, intensifying the mob's disruptiveness. And Alford engaged in further acts of disorderly or disruptive conduct while inside, including trying to open a door to allow more rioters to enter, moving deeper into the building in defiance of police orders to leave, and then delaying his exit as long as possible.

Alford's within-Guidelines sentence was also substantively reasonable. Sentencing disparity is avoided by following the Guidelines, rather than trying to match the sentences imposed on dissimilar January 6 defendants. Alford is one of the few January 6 misdemeanants who failed to secure a downward sentencing adjustment for acceptance of responsibility, and at the time of sentencing he was the only January 6 misdemeanant to earn an upward adjustment for testifying falsely. Those obvious differences fully justify Alford's longer sentence.

A<span style="font-variant:small-caps">RGUMENT</span>

## I.  Sufficient Evidence Established that Alford Engaged in Disorderly or Disruptive Conduct Under § 1752(a) and § 5104(e)(2)(D).

After introducing the statutes in Subpart A, we summarize their legislative history in Subpart B. In Subpart C we explain the plain meaning of "disorderly conduct" and "disruptive conduct," and in Subpart D we explain why statutory context offers no reason to narrow their plain meanings. Finally, in Subpart E, we explain why the trial evidence amply supported Alford's convictions for disorderly or disruptive conduct.

### A.  Statutes at Issue and Standard of Review

Section 1752 governs conduct in restricted areas being visited by someone protected by the Secret Service, like the Vice President and his family. *See* 18 U.S.C. § 1752(c). In such a restricted area, § 1752(a)(2) authorizes punishment of up to one year for anyone who

> knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions . . . .

The statute also applies to anyone who "attempts or conspires to do so." *Id.* § 1752(a).

18

Section 5104 outlaws certain activities in the Capitol buildings and grounds. Subsection (e)(2)(D) prohibits disorderly or disruptive conduct:

> (2) Violent entry and disorderly conduct.—An individual or group of individuals may not willfully and knowingly— . . .
>
>> (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress . . . .

40 U.S.C. § 5104(e)(2)(D). Violations and attempted violations are punishable by up to six months in prison. 40 U.S.C. § 5109(b).

This Court's review of the sufficiency of the evidence is "highly deferential." *United States v. Reynoso*, 38 F.4th 1083, 1089 (D.C. Cir. 2022). The question is "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Boyd*, 803 F.3d 690, 692 (D.C. Cir. 2015) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). That inquiry draws "no distinctions between direct and circumstantial evidence" and gives "full play to the right of the jury to determine credibility, weigh the evidence

and draw justifiable inferences of fact." *United States v. Clark*, 184 F.3d 858, 863 (D.C. Cir. 1999) (citation omitted).

## B.    Statutory and Legislative History

### 1.    Section 5104

The prohibition on disorderly or disruptive conduct at the Capitol was enacted in 1967, as part of an amendment to § 5104's predecessor, (40 U.S.C. § 193f(b)). *See* Act of Oct. 20, 1967, Pub. L. No. 90-108, 81 Stat. 275. The language from the 1967 enactment is substantially similar to the modern statute, including the requirement that persons and groups not "engage in any disorderly or disruptive conduct, at any place upon the United States Capitol Grounds or within any of the Capitol Buildings with intent to impede, disrupt, or disturb the orderly conduct of any session of the Congress." *Id.*

The law was enacted in part in response to two 1967 decisions by this Court, which were appended to the House and Senate reports. *See* S. Rep. No. 90-573, at 3 (1967) (citing *Feeley v. District of Columbia*, 387 F.2d 216 (D.C. Cir. 1967); *Smith v. District of Columbia*, 387 F.2d 233 (D.C. Cir. 1967)); H.R. Rep. No. 90-745, at 3-4 (1967) (same). In *Feely*, a large group marched onto Capitol grounds and then "sat down, fully

20

occupying the walkway," demonstrating for more than an hour (despite police warnings) until they were arrested. 387 F.2d at 217. In *Smith*, a student group successfully presented a petition to the Speaker of the House, but then refused to leave without a commitment to act on their petition. 387 F.2d at 236. Instead, they "assembled in an alcove in the corridor." *Id.* The Capitol Police chief ordered them to go, explaining that "the building was being specially secured in anticipation of a visit by the President," but again they refused and began to sing, clap, stamp their feet, lie down, and lock arms. *Id.* In both cases, this Court reversed the convictions because a "maze of small statutes" in the D.C. Code potentially covered the conduct, but the trial-court proceedings had never precisely identified which statute was alleged to have been violated. *Feeley*, 387 F.2d at 220; *see also Smith*, 387 F.2d at 237.

The problem, the accompanying reports explained, was that recent years had brought "a substantial increase in the number of incidents of excessive disruption or disorderly conduct" at Congress. S. Rep. No. 90-573, at 2; H.R. Rep. No. 90-745, at 1; *see also Security of the Capitol Buildings: Hearing on S. 2310 Before the Subcomm. on Pub. Bldgs. & Grounds of the S. Comm. on Pub. Works*, 90th Cong. 29 (1967)

[hereinafter *Security of Capitol Buildings Hearing*] (letter from Mike Mansfield, Senate Majority Leader, citing multiple incidents in prior week, including "the showering down of leaflets on the Senate floor which called for a recess on the part of the Senate"). At the same time, *Feeley* and *Smith* had shown that existing statues prohibiting disorderly conduct in the District of Columbia were not adequately addressing the issue. Indeed, the House and Senate reports understood *Freely* and *Smith* to indicate that disorderly conduct in Congress should be charged under D.C. Code § 22-3111, a statute then punishable by only a $50 fine. *See* S. Rep. No. 90-573, at 3; H.R. Rep. No. 90-745, at 3; *accord Security of the Capitol Buildings Hearing* 11-12) (statement of David G. Bress, U.S. Att'y, Dist. of Columbia); *see also Smith*, 387 F.2d at 235.

The new law struck a compromise between two "sometimes conflicting goals." S. Rep. No. 90-573, at 2; H.R. Rep. No. 90-745, at 2. "[P]eople with strong feelings must be assured of the rights of freedom of expression and of assembly and the right to petition their Government . . . ." *Id.* "[B]ut under no circumstances should the guarantee of these rights be extended to a license for a minority to delay,

impede, or otherwise disrupt the orderly processes of the legislature which represents all Americans." *Id.*

The law thus includes "a misdemeanor category covering a wide range of disruptive or disorderly conduct." S. Rep. No. 90-573, at 3; H.R. Rep. No. 90-745, at 4. As to current subsection (e)(2)(D) specifically, "[t]he purpose of this paragraph is to prohibit any conduct which would unreasonably and unnecessarily hinder the prosecution of legislative business." S. Rep. No. 90-573, at 5; H.R. Rep. No. 90-745, at 6. Such conduct has "no justification," and thus should "not be permitted anywhere on the Capitol Grounds or in the Capitol Buildings." *Id.*

In 2002, as part of a general reorganization of Title 40, the prohibition on disorderly or disruptive conduct in the Capitol buildings or grounds moved to its current home in § 5104. *See* Revision of Title 40, Pub. L. No. 107-217, 116 Stat. 1062 (2002).

## 2.    Section 1752

1971 saw the enactment of § 1752's similar prohibition on disorderly or disruptive conduct in areas restricted by the Secret Service. *See* Omnibus Crime Control Act of 1970, Pub. L. No. 91-644, § 18, 84 Stat. 1880, 1891-92 (1971). That original enactment largely tracked the

language of the modern statute, though notably, it (like § 5104(e)(2)) explicitly applied to any "person or group of persons." *Id.*

Section 1752 was apparently added to the bill after it was reported out of committee, as an amendment in the Senate. In the conference report, the House managers later explained that this language "penalizes intentional disruption of the conduct of Government business or official functions" in restricted areas. H.R. Rep. No. 91-1768, at 21 (1970).

The 1971 enactment focused specifically on protecting the President and defined the restricted grounds as the places where the President was temporarily living, working, or visiting. *See* 84 Stat. at 1891-92. The restricted grounds were expanded in 1982 to include similar areas used or visited by any "other person protected by the Secret Service." Act of Oct. 14, 1982, Pub. L. No. 97-308, 96 Stat 1451. That expansion "stem[med] from a recommendation of the House Select Committee on Assassinations." H.R. Rep. No. 97-451, at 1-2 (1982). Section 1752 was revised and simplified in 2012, also adding a requirement that the conduct be done "knowingly." *See* Federal Restricted Buildings and Grounds Improvement Act of 2011, Pub. L. No. 112-98, 126 Stat. 263 (2012); *see also* H.R. Rep. No. 112-9 (2011).

## C. The Plain Meanings of "Disruptive Conduct" and "Disorderly Conduct"

Contrary to Alford's suggestions that "disorderly conduct" and "disruptive conduct" are empty terms in need of limiting, these are common terms with established meanings. Their plain meanings broadly cover any conduct that tends to interrupt governmental proceedings or disturb the public peace. *See Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 776 (2020) ("'We must enforce plain and unambiguous statutory language . . . according to its terms.'"). Alford seeks to limit these terms to "*inherently* disorderly or disruptive behavior" (Appellant's Brief (Br.) 29, 34-35) (emphasis added). But determining whether something is "disruptive" or "disorderly" necessarily turns on the factual circumstances of the case.

### 1. "Disruptive Conduct"

"Disruptive conduct" was not a recognized legal term of art at the time of § 1752's and § 5104's enactments. "Disruptive," though, had a clear meaning: "causing or tending to cause disruption." *Webster's Third New International Dictionary* 656 (1966). "Disrupt," in turn, meant "to

interrupt to the extent of stopping, preventing normal continuance of, or destroying." *Id.*[1]

The plain meanings of "disrupt" and "disruptive" do not require any aggression or noise. For example, if a wedding guest silently walks to the front of the ceremony and steps between the bride and groom as they are about to kiss, we would say that that person "disrupted" the wedding, although he acted calmly and made no sound. The key requirement, rather, is the action's tendency to interrupt.

---

[1] *See also Webster's Third New International Dictionary* 656 (1966) ) ("to throw into disorder or turmoil"); *The Random House Dictionary of the English Language: The Unabridged Edition* 415 (1971) ("1. to cause disorder or turmoil in: *The news disrupted their conference.* 2. to destroy, usually temporarily, the normal continuance or unity of; interrupt: *Telephone service was disrupted for hours.*"); *American Heritage Dictionary of the English Language* 381 (1969) ("[t]o upset the order of; throw into confusion or disorder" or "[t]o interrupt or impede the progress, movement, or procedure of").

*Black's* now recognizes "disruptive conduct" as a cousin of disorderly conduct: "Disorderly conduct in the context of a governmental proceeding. See Contempt." *Black's Law Dictionary* 370 (11th ed. 2019). The cross-referenced "contempt" definition explains that contempt includes "an interruption of [a legislative or judicial body's] proceedings by disorderly behavior or insolent language, in its presence or so near thereto as to disturb the proceedings or to impair the respect due to such a body." *Id.* at 397 (quoting Edward M. Dangel, *Contempt* § 1, at 2 (1939)).

Case law on what makes conduct "disruptive" confirms these plain meanings. Evaluations of what conduct "disrupts or is about to disrupt" should be made "on an individualized basis, given the particular fact situation." *Grayned v. City of Rockford*, 408 U.S. 104, 119 (1972). For example, in upholding a prohibition on "harangues" and "orations" in the Supreme Court, this Court explained that the touchstone of those prohibitions was that they "tend to disrupt the [Supreme] Court's operations." *United States v. Bronstein*, 849 F.3d 1101, 1109 (D.C. Cir. 2017). And in deciding what "disrupts," this Court recognized, "context[ ]" will determine the circumstances in which a particular type of conduct— public speaking—is barred. *Id.* So, for example, "[a] tour guide's 'speech' to Court tourists" would "not fall within the statute's ambit, as it does not tend to disrupt the Court's operations and decorum." *Id.* Likewise, oral argument falls outside of the statute, as it "do[es] not tend to disrupt the Court's operations (well, arguably)." *Id.*

Further, "disruptive" is not an especially high bar. The Supreme Court has upheld restrictions on solicitation at post offices on the ground that solicitation "is inherently disruptive of the Postal Service's business" by "imped[ing] the normal flow of traffic" and "requir[ing] action by those

27

who would respond." *United States v. Kokinda*, 497 U.S. 720, 732-35 (1990) (plurality). And *Bronstein* recognized that short "coordinated" statements by five members of the audience after the Justices took the bench, "last[ing] approximately two to four minutes," could "easily" qualify as public speeches "that tended to disrupt the Court's operations." 849 F.3d at 1105, 1110-11.

## 2.    "Disorderly Conduct"

By contrast, disorderly conduct is a legal term of art (cf. Br. 29). Because it "'is obviously transplanted from another legal source . . . [it] brings the old soil with it.'" *Sekhar v. United States*, 570 U.S. 729, 733 (2013). Both at the time of enactment and today, "disorderly conduct" meant "[b]ehavior that tends to disturb the public peace, offend public morals, or undermine public safety." *Black's Law Dictionary* 370 (11th ed. 2019) (defined under "conduct"); *see Black's Law Dictionary* 556 (rev. 4th ed. 1968) ("A term of loose and indefinite meaning (except as occasionally defined in statutes), but signifying generally any behavior that is contrary to law, and more particularly such as tends to disturb the public peace or decorum, scandalize the community, or shock the

public sense of morality.").[2] "In general," disorderly conduct includes "any words and acts which tend to disturb the peace or endanger the morals, safety, or health of the community, or of a class of persons." 27 C.J.S. *Disorderly Conduct* § 2 (May 2023 update).

Disorderly conduct's common-law roots help define its coverage. While disorderly conduct was not itself an offense at common law, it grew out of the common-law offense of breach of the peace. *See* 2 *Model Penal Code* § 250.2 cmt. 1 (Official Draft and Revised Commentaries 1980); 3 *Wharton's Criminal Law* § 37:2 (16th ed. Sept. 2022 update); 27 C.J.S. *Disorderly Conduct* § 1; *see generally* 4 William Blackstone, *Commentaries* \*142-53 (explaining breach of the peace). Indeed, disorderly conduct broadened that common-law offense. *See* 2 *Model Penal Code* § 250.2 cmt. 1; *State v. Ferreira*, 709 P.2d 607, 610 (Haw. 1985) (citing M. Bassiouni, *Substantive Criminal Law* § 14.1 (1978)).

---

[2] *See also American Heritage Dictionary of the English Language* 379 (1969) ) ("Any of various petty offenses involving a disturbance of public peace and decorum."); *The Random House Dictionary of the English Language: The Unabridged Edition* 413 (1971) ("any of various petty misdemeanors, generally including nuisances, breaches of the peace, offensive or immoral conduct in public, etc."); *Webster's Third New International Dictionary* 652 (1966 ("one of a wide range of petty offenses chiefly against public order and decency").

"The offense known as breach of the peace embraces a great variety of conduct destroying or menacing public order and tranquility." *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940); *see* 2 *Model Penal Code* § 250.2 cmt. 1 (breach of the peace traditionally included "any behavior that disturbed or tended to disturb the tranquility of the citizenry"). "When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious." *Cantwell*, 310 U.S. at 308.

Disorderly conduct captured all breaches of the peace, plus it added "conduct tending to corrupt morals, to endanger health or safety, or simply to annoy other members of the community." 2 *Model Penal Code* § 250.2 cmt. 1; *accord Black's Law Dictionary* 370 (11th ed. 2019). That means "[o]ne who commits a breach of the peace is guilty of disorderly conduct, but not all disorderly conduct is necessarily a 'breach of the peace.'" *Black's Law Dictionary* 171 (5th ed. 1979); *accord* 27 C.J.S. *Disorderly Conduct* § 2.

Disorderly conduct, like breach of the peace, "has never had a precise meaning in relation to specific conduct," but "it has received a

fairly well defined gloss." *United States v. Woodard*, 376 F.2d 136, 141 (7th Cir. 1967). Three related glosses on disorderly conduct are particularly relevant here and undermine Alford's efforts to unduly narrow the term's meaning.

*First*, what counts as "disorderly conduct" or "breach of the peace" depends on not only the act but also the "accompanying circumstances, that is, it is essential that the setting be considered." *Woodard*, 376 F.2d at 141; *see* 27 C.J.S. *Disorderly Conduct* § 3; *Williams v. District of Columbia*, 419 F.2d 638, 645-46 (D.C. Cir. 1969) (en banc).[3] Put another way, conduct that is normally unobjectionable—like joining a group inside of the U.S. Capitol building—may nonetheless tend to breach the public peace (and thus qualify as disorderly conduct) in particular circumstances. *See Feiner v. New York*, 340 U.S. 315, 320-21 (1951) (in upholding breach of peace conviction, "[t]his Court respects, as it must,

---

[3] *See also, e.g.*, *Rodgers v. United States*, 290 A.2d 395, 396 (D.C. 1972); *City of Chicago v. Wender*, 262 N.E.2d 470, 472 (Ill. 1970); *State v. Reynolds*, 66 N.W.2d 886, 890 (Minn. 1954); *People v. Munafo*, 406 N.E.2d 780, 783 (N.Y. 1980); *Morrison v. State*, 237 S.W.2d 548, 550 (Tenn. 1951); *Collins v. City of Norfolk*, 41 S.E.2d 448, 450 (Va. 1947); *State v. Maker*, 180 N.W.2d 707, 709 (Wis. 1970).

the interest of the community in maintaining peace and order on its streets").

*Second*, disorderly conduct includes even "quiet[ ] or secret[ ]" conduct that tends to cause others to disturb the public peace, "as when a person challenged someone to a duel." *Black's Law Dictionary* 370 (11th ed. 2019) (quoting Francis Barry McCarthy, Vagrancy and Disorderly Conduct, *in* 4 *Encyclopedia of Crime and Justice* 1589, 1589 (Sanford H. Kadish ed., 1983)); *see Cantwell*, 310 U.S. at 308; 2 *Model Penal Code* § 250.2 cmt. 1; *see also Feiner*, 340 U.S. at 320-21. That, too, is consistent with the common law: "BESIDES actual breaches of the peace, any thing that tends to provoke or excite others to break it, is an offence of the same denomination." 4 Blackstone, *Commentaries* *149.

*Third*, unlike the many crimes that proscribe specific *actions*— breaking and entering at night for burglary, unlawful taking by force for robbery—disorderly conduct focuses on the *likely result* of the conduct, covering an array of actions that tend to "cause consternation and alarm and thus disturb the tranquility of citizens or of a community, threatening the security and invading the protection which the law affords to every citizen." *United States v. Bridgeman*, 523 F.2d 1099, 1114

32

n.12 (D.C. Cir. 1975). It may include "passive conduct likely to cause a public disturbance." *Garner v. Louisiana*, 368 U.S. 157, 173-74 (1961). That is because "[p]eople blocking traffic at a critical intersection may breach the peace as fully as those who hurl stones." *Wash. Mobilization Comm. v. Cullinane*, 566 F.2d 107, 116 (D.C. Cir. 1977). Even normally protected activities like picketing may become disorderly in some circumstances, such as when "customers of the place picketed are disturbed or threatened." 27 C.J.S. *Disorderly Conduct* § 4. Before reversing a disorderly-conduct conviction for lack of evidence, the Court thus looked for evidence that the defendant "engaged *in any conduct of any kind likely in any way* to adversely affect the good order and tranquillity" of the place. *Thompson v. City of Louisville*, 362 U.S. 199, 205-06 (1960) (emphasis added), *abrogated on other grounds by Jackson*, 443 U.S. 307.

### D.   Statutory Context Does Not Displace the Plain Meanings of "Disruptive Conduct" and "Disorderly Conduct"

Alford primarily responds (Br. 27-31) that statutory context here narrows the normal meanings of "disorderly conduct" and "disruptive conduct," limiting them to "*inherently* disorderly or disruptive conduct."

33

But these terms are poor candidates for such a narrowing. For one thing, "where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind." *Morissette v. United States*, 342 U.S. 246, 263 (1952). For another, determining whether conduct is "disruptive" or "disorderly" necessarily depends on context. Indeed, it is hard to conceive of behavior that would *always* be disruptive or disorderly, no matter where or when it occurred. Screaming one's head off is appropriate (not disorderly) at a football game. Shooting off fireworks is not disruptive on the Fourth of July. Even firing a gun "does not tend to disrupt" if "[a] security officer . . . discharges his firearm to protect the Court." *Bronstein*, 849 F.3d at 1109.

In any event, Alford's narrowing arguments fail on their own terms. Alford suggests that applying the normal understanding of "disorderly or disruptive conduct" will create surplusage, because any conduct done with "the intent to impede, disrupt, or disturb" will inevitably qualify, reading "disorderly or disruptive" out of the statute (see Br. 27-28). *See*

*Advoc. Health Care Network v. Stapleton*, 581 U.S. 468, 477 (2017) (surplusage canon gives a "presumption that each word Congress uses is there for a reason"). But there is no surplusage here. Rather, as hypotheticals offered during the Senate hearing on the law illustrated, the intent and conduct requirements each do independent work. For example, if a person inconsiderately "yell[s] across the [hearing] room to somebody to meet him for lunch," that might be "a willful act but not an intention to disrupt." *Security of Capitol Buildings Hearing* 7 (statement of U.S. Att'y Bress). On the flip side, if demonstrators on Capitol grounds "at the farthest point from the Capitol" engage in a protest that they hope will disrupt an ongoing hearing, but they are so far away that "there is no possibility that it could," they have an intent to disrupt but have not engaged in disorderly or disruptive conduct. *Id.* at 28 (statement of Lawrence Speiser, ACLU). Likewise, it is easy to imagine conduct that is intended to disrupt or disturb, but that it is so trivial that no disruption is likely—for example, an audience member loudly sucking a cough drop, purposely taking a long time to get seated, or angrily glaring at a Senator who is questioning a witness.

Anyway, a certain amount of overlap between the elements is baked into the statutory language. By punishing (in simplified form) "disorderly or disruptive conduct" with "intent to impede or disrupt," conduct that satisfies one statutory element will very likely also satisfy the other one. Responding to that foreseeable overlap by narrowing the plain, established meaning of "disorderly or disruptive conduct" would distort the statute. Indeed, even in cases of true surplusage, avoiding redundancy "can supply a clue as to the better interpretation of a statute. But only a clue. Sometimes the better overall reading of the statute contains some redundancy." *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019). And here, the history of disorderly-conduct statutes make clear that such intent elements were added to protect the unintentionally disruptive—like the staffer who calls across the room to arrange lunch—rather than to limit the conduct qualifying as "disorderly."[4] The statutes' intent requirements thus give no grounds to revisit the plain meaning of "disorderly or disruptive conduct."

---

[4] *See* 2 *Model Penal Code* § 250.2 cmt. 2 (proposing mens rea of purpose or recklessness to ensure disorderly conduct "demands more than that a person act in a manner offensive to the community"); 27 C.J.S. *Disorderly Conduct* § 1, 3 (explaining that "willful or unlawful purpose is not an

(continued . . . )

The same goes for § 1752's requirement—not found in § 5104—that the conduct occur "when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions." Conduct done "when, or so that," it "in fact" impedes or disrupts government business will very likely also both (a) qualify as "disorderly or disruptive" and (b) be done with an "intent to impede or disrupt." But that inevitable overlap provides no justification for narrowing the established meaning of "disorderly or disruptive conduct": "When a statute's text, context, and history all converge on certain terms possessing a settled legal meaning, the Court should effectuate it. The alternative—following a *presumption* of legislative precision over the Constitution's precipice—does not vindicate substance. It privileges theory." *Bronstein*, 849 F.3d at 1110.

Alternatively, Alford suggest that the definition of "disorderly or disruptive conduct" be informed by the canons of *ejusdem generis* and *noscitur a sociis* (Br. 28-29). According to Alford, because § 5104(e)(2)(D) covers "utter[ing] loud, threatening, or abusive language, *or* engag[ing]

_____

element of the offense of disorderly conduct unless made so by statute," and such intent requirements protect against constitutional challenges).

37

in disorderly or disruptive conduct," these canons support limiting "disorderly or disruptive conduct" to conduct like "loud, threatening, or abusive language" (Br. 28).

Notably, § 1752(a)(2) includes no separate prohibition on "loud, threatening, or abusive language." Alford never explains why these canons would apply to § 1752. Nor does he explain why "disorderly or disruptive conduct" would bear different meanings in § 5104 and § 1752—the only two places the phrase appears in the U.S. Code.

In any event, neither canon applies here. *Ejusdem generis* "'applies when a drafter has tacked on a catchall phrase at the end of an enumeration of specifics, as in *dog, cats, horses, cattle, and other animals*.'" *United States v. Fischer*, 64 F.4th 329, 345 (D.C. Cir. 2023) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 199 (2012)); *see also Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1789 (2022). There is no list of specifics followed by a catchall in § 5104(a)(2)(D), however. Instead, there are two alternative acts—"[(a)] utter loud, threatening, or abusive language, or [(b)] engage in disorderly or disruptive conduct"—each with their own verb, without even a linking "other" to indicate they are related. *See*

38

*Fischer*, 64 F.4th at 346 ("[t]he subsections' disparate verbs and objects defy any attempt to group them together"). Even if we understand "loud, threatening, or abusive language" to be a specific type of "disorderly or disruptive conduct," *ejusdem generis* does not apply to a "disjunctive" phrase with only "one specific and one general category." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008).

Nor is this a case for *noscitur a sociis*, which recognizes that "a word is known by the company it keeps," and is "often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *McDonnell v. United States*, 579 U.S. 550, 569 (2016) (quotation marks omitted). Alford identifies no recognized alternative "meaning[ ]" of "disorderly or disruptive conduct" that would raise ambiguity about the term's scope. Further, *noscitur a sociis* "requires some context cues indicating that the statutory text should be limited by its company, and 'especially holds that words grouped in a list should be given related meanings.'" *Fischer*, 64 F.4th at 346 (quoting Scalia & Garner, *Reading Law* 195) (citation and some quotation marks omitted). Section 5104's single alternative to "disorderly or disruptive conduct" proves insufficient "to extrapolate a common

39

feature": "The argument seems to assume that pairing a broad statutory term with a narrow one shrinks the broad one, but there is no such general usage; giving one example does not convert express inclusion into restrictive equation, and *noscitur a sociis* is no help absent some sort of gathering with a common feature to extrapolate." *S.D. Warren Co. v. Maine Bd. of Env't Prot.*, 547 U.S. 370, 379-80 (2006); *see also Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 288 (2010) (rejecting *noscitur a sociis* because "[a] list of three items, each quite distinct from the other no matter how construed, is too short to be particularly illuminating"); *Ali*, 552 U.S. at 225 ("no relevant common attribute immediately appears" from a single alternative).

Finally, Alford points to the lack of specifics in § 1752 and § 5104 as to what constitutes "disorderly or disruptive conduct," noting that some state statutes identify particular behavior that will be deemed disorderly (Br. 29-31). But even if some disorderly-conduct statutes offer more specificity, Alford never claims similar specificity in disruptive-conduct statutes. In fact, court rules commonly prohibit conduct that "disrupts," without further specification of what exactly counts as

"disruptive."[5] As explained below, the prohibition on "disruptive conduct" alone fully captured Alford's behavior.

Further, the choice by *some* jurisdictions to offer more specific definitions of "disorderly conduct" does not require *all* jurisdictions to do so. Indeed, jurisdictions have long differed on this score, with some offering "only the most general description of prohibited conduct, while others detailed long lists of proscribed actions." 2 *Model Penal Code* § 250.2 cmt. 1; *see also Black's Law Dictionary* 556 (rev. 4th ed. 1968) (defining "disorderly conduct" as "a term of loose and indefinite meaning (*except as occasionally defined in statutes*)") (emphasis added). Commentators note that the long lists of "grabbags of criminal

---

[5] *See, e.g.*, D.C. Cir. Courthouse Decorum Policy (Dec. 13, 2022) (prohibiting, consistent with 41 C.F.R. § 102-74.390, "conduct" that "impedes or disrupts the performance of official duties by government employees"); *United States v. Baldwin*, 745 F.3d 1027, 1032 (10th Cir. 2014) (Gorsuch, J.) (rejecting vagueness challenge to § 102-74.390's "impedes or disrupts" regulation on facts of case); Fed. R. Crim. P. 15(c)(1)(B) (permitting criminal deposition outside of defendant's presence when he "persists in disruptive conduct justifying exclusion after being warned by the court that disruptive conduct will result in the defendant's exclusion"); Fed. R. Crim. P. 43(c)(1)(C) (permitting continuance of trial without defendant "when the court warns the defendant that it will remove the defendant from the courtroom for disruptive behavior, but the defendant persists in conduct that justifies removal from the courtroom").

41

prohibitions" in disorderly-conduct statutes offer "no substantial improvement" over the general prohibitions. 2 *Model Penal Code* § 250.2 cmt. 1. Alford certainly cites nothing suggesting that a general prohibition on "disorderly conduct" is categorically invalid.

### E. Sufficient Evidence Established that Alford Engaged in "Disruptive Conduct" and "Disorderly Conduct"

In denying the motion for judgment of acquittal, the district court rightly explained that the evidence sufficiently established that Alford had engaged in "disorderly or disruptive conduct" (A898-99). Indeed, the court explained, his conduct qualified under many rationales. For one thing, his own "mere presence" in the Capitol building on January 6 directly prevented resumption of Congress's proceedings: "[T]he Electoral College vote-counting process was, in fact, disrupted by the continued presence of Mr. Alford and others in the Capitol. It could not continue until he and everyone else not authorized to be there that day were cleared from the premises." (A899.) For another, "his presence was an aspect of the disorder and disruption of the Capitol on January 6," "apt[ly]" analogized to "raindrops in a flood" by Judge Kollar-Kotelly (*id.*): "Just as heavy rains cause a flood in a field, each individual raindrop

itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted Congressional proceedings, and each individual rioter contributed to that disruption." *United States v. Rivera*, 607 F. Supp. 3d 1, 9 (D.D.C. 2022) (appeal pending).[6] Further, Alford's presence "undermined public safety by contributing to a diversion of public safety resources," as police had to be "pulled from their assignments and beats citywide, and redeployed to empty the Capitol of people not authorized to be there" (A898).

Alford objects to his "mere presence" in the Capitol building being a basis for finding "disorderly or disruptive conduct." "Mere presence" understates the conduct of Alford, who made a conscious choice to join the mob that entered the Capitol. *See* SA36 (district court explaining at sentencing that Alford, upon seeing the chaos and violence at the Capitol, could have "said no, I don't want to be part of this and just stood" outside,

---

[6] Alford objects that *Rivera* was addressing whether Rivera's conduct in fact disrupted Congress, rather than whether it was "disorderly or disruptive," and he further argues that *Rivera*'s language was dicta (Br. 32-34). But *Rivera* obviously provides no binding precedent here. The district court below (like the government now) cited the language for its power to persuade, rather than its power to bind.

but instead he "walked in")). But "[e]ven the presence of just *one* unauthorized person in the Capitol is reason to halt Congressional business as Capitol Police (and, in this case, many other law enforcement agencies) track down the intruder." *United States v. Griffith*, No. CR 21-244-2 (CKK), 2023 WL 3477249, at *6 (D.D.C. May 16, 2023). As witnesses explained here, none of the rioters had been "screened properly or had any valid ID to be in there," meaning that law-enforcement "didn't know what was on them, what they had in their bags, or if they had any sort of dangerous weapon or what their intent was" (A692-95; see A380-82). And indeed, the electoral certification could not resume until officers "had cleared the entire building and then gone through the building to make sure nothing was left behind," like "explosives" (A694-95). Preventing the resumption of a congressional session neatly fits the plain meaning of "disruptive" conduct.[7]

---

[7] *See also Smith-Caronia v. United States*, 714 A.2d 764, 765-67 & n.1 (D.C. 1998) (rejecting argument that parallel D.C. Code statute should be limited to "more than 'de minimis'" disruptions of Congress; statute covers behavior that is "disruptive, or nearly so"); *Bynum v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50, 56 (D.D.C. 2000) ("[t]he government has a legitimate interest in ensuring that the activities of Congress proceed without disruption").

In any event, Alford's conduct cannot be separated from the circumstances in which he acted. By entering the Capitol building on January 6, intending to disrupt and impede Congress, Alford—and others like him—joined the mob unlawfully occupying Congress. Alford concedes that the jury "could infer that he intended to impede or disrupt Congress" and "could find that Congress actually was disrupted by his presence alongside others" (Br. 34). And the defense below agreed that the government could properly argue that joining a disorderly or disruptive group was itself disorderly and disruptive conduct (A1117-18). That is exactly what a rational jury could find on this evidence. As the district court told Alford at sentencing: "Your presence in the Capitol lent support to the mob. And helped terrify the patriots, the real patriots who are the people inside, the men and women inside that building trying to do their job and fulfill the constitutional directive to transfer power in this country." (SA35-36.)

Nor was joining the mob merely "passive[ ]" activity (cf. Br. 34). To be in the halls of Congress that day, Alford had needed to find a "broken open" door through which he could enter. He needed to persist in entering despite the alarms and other signals that he was part of the disturbance.

And he needed to proceed inside unscreened by security, despite common-sense indications that such screenings were required.

Joining that mob—established by "presence in [that] unlawful mob"—was both disruptive and disorderly conduct. *Rivera*, 607 F. Supp. 3d at 8; *see also United States v. Grider*, No. CR 21-022 (CKK), 2022 WL 17829149, at *12 (D.D.C. Dec. 21, 2022) (appeal pending) ("Membership in a mass of rioters is particularly likely to disrupt Congressional business. Even a peaceful crowd standing on the Floor of Congress is likely to shut down Congressional proceedings."). By his very presence, Alford increased the mob's numbers. As *Rivera* recognized, that act of joining the mob was disruptive conduct, because it tended to interrupt to the extent of stopping, preventing normal continuance of Congress's orderly session. *See* 607 F. Supp. 3d at 8. It was also disorderly conduct, as it tended to "further[ ] the mob's 'disturb[ing] the public peace,'" *id.*, and its "undermin[ing] public safety." Indeed, the January 6 attack on and occupation of the Capitol was the ultimate breach of the peace. It "destroy[ed] or menac[ed] public order and tranquility." *Cantwell*, 310 U.S. at 308. It "cause[d] consternation and alarm" throughout the Nation.

46

*Bridgeman*, 523 F.2d at 1114 n.12. By joining that occupation, Alford engaged in disruptive and disorderly conduct.

Notably, the statutory text contemplates conduct that becomes disruptive or disorderly through group action. Section 5104(e)(2)(D) prohibits "[a]n individual *or group of individuals*" from engaging in disorderly or disruptive conduct. The original version of § 1752 similarly prohibited disorderly or disruptive conduct by a "person *or group of persons*." 84 Stat. at 1891-92. While that language was removed as part of a simplification of the statute when it was recodified in § 1752(a)(2), there is no reason to think the meaning of "disorderly or disruptive conduct" changed.

The verb that proceeds "disorderly or disruptive conduct" in both statutes—"*engages* in"—likewise covers joining group action. "Engage" means "[t]o employ *or involve one's self*; *to take part in*; to embark on." *Black's Law Dictionary* 622 (rev. 4th ed. 1968) (emphasis added); *Black's Law Dictionary* 669 (11th ed. 2019) (same).[8] In evaluating whether Alford

---

[8] *See also The Random House Dictionary of the English Language: The Unabridged Edition* 473 (1971) ("to occupy oneself; become involved"); *American Heritage Dictionary of the English Language* 433 (1969) ("[t]o involve oneself or become occupied; participate").

47

"engaged in" disorderly or disruptive conduct in the Capitol, a jury did not need to pretend he was standing in an empty hallway; it could consider that he "took part in" a mob.

Further, these statutes are meant to address situations where the presence of protesting groups cause interruptions or threaten order and safety, as reflected in the case law. Section 5104(e)(2) was enacted partially in response to this Court's reversal in *Smith*, involving notable parallels: a group assembling inside a Capitol hallway and refusing to leave, despite the building "being specially secured in anticipation of a visit by the President." 387 F.2d at 217, 236. Moreover, this Court pointed to § 5104(e)(2)(D) as a restriction that will "promote safety and orderly traffic flow" during large protests, justifying the invalidation of more restrictive regulations. *Lederman v. United States*, 291 F.3d 36, 45-46 (D.C. Cir. 2002). And a precedential decision by a three-judge district court explained that the restrictions in § 5104(e)(2) meant Congress was not "threatened with a state of anarchy" by protesting groups. *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 587-88 (D.D.C.), *aff'd*, 409 U.S. 972 (1972) (mem.). Alford's act of joining the mob

48

in the Capitol building on January 6 suffices to establish disorderly or disruptive conduct.

Moreover, a jury could find Alford committed at least four acts that "tended to" disrupt or breach the peace beyond entering the Capitol building unscreened and joining the mob. First, as soon as Alford walked through the open half of the double-door, he was one of the few rioters who turned to the adjacent closed door and tried (unsuccessfully) to open it too, conduct tending to allow more rioters to enter. Second, and again unusually among those who entered, Alford walked through the metal detector soon after entering and set off the lights on the alarm. A jury could reasonably find that the alarm also sounded and added to the cacophony of noise there. Third, when he was told to get out by police officers, Alford turned and went the opposite way from the exit, deeper into the hallway. And fourth, when the crowd finally forced him back to the exit, he lingered at the door for more than two minutes, resisting even this final, inevitable departure. Alford's attempts to portray himself as merely standing noiselessly in the hallway, diligently complying with all police orders (see Br. 34), do not fit the record—especially on deferential sufficiency review. Alford's convictions should be affirmed.

49

## II.    Alford's    In-Guidelines    Sentence    Was Substantively Reasonable.

### A.    Additional Background

The parties and court below largely agreed on the appropriate U.S. Sentencing Guidelines calculation in the case: The guideline applicable to Count 2 was § 2A2.4, for obstructing or impeding officers, giving an offense level of 10 (SA05). Count 1 was grouped with Count 2, and no guidelines applied to the less serious Counts 3 and 4 (*id.*). Alford was not entitled to a 2- or 3-point downward adjustment for acceptance of responsibility under § 3E1.1 (SA06). But he was subject to a 2-point upward adjustment for obstructing or impeding the administration of justice under § 3C1.1, because he had provided materially false testimony at trial (SA06-07). While preserving an objection to that upward adjustment, Alford acknowledged that "the commentary to this guideline does indicate that the government's position is well founded," and the court agreed with the government that "Alford provided false testimony" and was thus subject to the adjustment (SA07). That yielded an offense level of 12, and given Alford's lack of prior convictions, the Guidelines sentencing range was 10 to 16 months of imprisonment

(SA07-10). No one argued that there were any grounds for a departure (SA08), leaving 10-16 months as the recommended sentencing range.

Alford argued for a split sentence of five months in prison and five months of home confinement with electronic monitoring (SA29). He stressed, in particular, that no other January 6 defendant convicted of misdemeanors had received a sentence longer than eight months, even when the defendant's conduct on January 6 appeared worse than Alford's (SA20-27; see ECF 107). Counsel acknowledged, though, that "Alford's decision to proceed to trial and testify are meaningful distinctions" from those other defendants (SA20).

The government sought a sentence of 13 months, in the middle of the Guidelines range (SA17). That sentence would create no undue disparity, the government explained, because "[t]here really aren't a lot of comparators here": At the time of sentencing, Alford's case was just the third misdemeanor January 6 case to have gone to trial and reached sentencing (SA11). And even those other two tried cases—which included the *Rivera* case that yielded a sentence of eight months—stood on different footing, because they had not included an upward adjustment under § 3C1.1 for false trial testimony (SA11, SA14-15). Further, the

51

government noted, in the days before January 6, Alford had shown "a willingness to contemplate political violence" when he "blustered" about "using [his] firearms against people on the other side of the aisle" like "BLM," declaring that there was a civil war going on and "[t]he South will save this country" (SA16; GE307; see also A1002-16). And in his statements and trial testimony, Alford showed no "amount of reflection on why his behavior was harmful" (SA13-14).

The district court sentenced Alford to a total of 12 months of incarceration (SA42-43). It explained that the "days and days of witness testimony and videotape and audio tape" had "really brought home the horror of what happened on January 6th" (SA34-35). While Alford "may not have been breaking any glass, or stealing anything, or screaming anything," he already got the benefit of that "relative lack of culpability by being charged with misdemeanors" (SA35). And the fact that others committed worse acts did not lessen the seriousness of his own conduct: "Your presence in that Capitol lent support to the mob" and "helped that mob almost succeed in what they were trying to do" (SA35-37).

Alford's testimony and statements also bore on the appropriate sentence. While he had "an absolute right to take the stand," the court

was entitled to weigh its own assessment that Alford had not "testified truthfully" (SA37). And although the testimony may not have risen to "deliberate falsehoods," it "was disingenuous, in [the court's] assessment, and not forthcoming" and not "entirely truthful" (SA37-39). He had "tried to minimize [his] culpability, [and] mischaracterized some of [his] actions and motivations" (SA37-38). Moreover, the court was "struck" that even after sitting through trial, Alford "sat there and opined that [he] believed . . . that parts of it were staged": "That anybody could observe the events that day or after that day, and observe the testimony and evidence that were portrayed in this trial and not be struck by the seriousness of them is really troubling to me" (SA38-39). That lack of recognition by Alford (and others) highlighted the deterrence considerations at play in the case: "you're going to believe what you want to believe, but it has to be clear to anyone who ever considers doing anything like this . . . that there will be certain, swift, and serious punishment" (SA39-40).

As to disparity, the district court agreed with the government that Alford was "not similarly situated" to the other defendants he invoked (SA41-42). The court was "not going to penalize" Alford for going to trial (*id.*). But at the same time, by foregoing the plea offers that almost all

other misdemeanor January 6 defendants had accepted—deals that had "minimized [their] exposure significantly"—Alford had missed the opportunity to "get the benefit of acceptance of responsibility and assistance to the government that he would have with a plea offer" (*id*.). Further, Alford had been the lone misdemeanant who offered "disingenuous" testimony reflecting a "lack of awareness for the seriousness and gravity of what happened that day" (SA32; SA36-39; SA41-42). Those distinctive considerations of "credibility" and testimony bore on "what punishment to give" (SA41-42).

## B.    Applicable Legal Principles and Standard of Review

This Court "consider[s] the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard," "tak[ing] into account the totality of the circumstances." *Gall v. United States*, 552 U.S. 38, 51 (2007). The sentencing judge "is in a superior position to find facts and judge their import under [18 U.S.C] § 3553(a) in the individual case." *Id.* (citation omitted). "[W]hen a within-Guidelines sentence is challenged on appeal, this Court applies a presumption of reasonableness." *United States v. Parks*, 995 F.3d 241, 248 (D.C. Cir. 2021). This Court's "review of criminal sentences for substantive reasonableness is quite deferential.

It will be the unusual case when an appeals court can plausibly say that a sentence is so unreasonably high or low as to constitute an abuse of discretion." *United States v. Knight*, 824 F.3d 1105, 1110-11 (D.C. Cir. 2016) (quotation marks omitted).

### C.    Alford's Sentence Was Reasonable

Everyone agrees that the district court correctly calculated the sentencing range that the Guidelines recommend for Alford's convictions: 10 to 16 months of incarceration (see Br. 51). Based on the § 3553(a) factors, including that Guidelines range, the district court imposed a sentence on the lower end of that range: 12 months. On appeal, this Court presumes that sentence reasonable. *Parks*, 995 F.3d at 248. Alford fails to establish that this is the "unusual case" where the sentence is "so unreasonably high" "as to constitute an abuse of discretion." *Knight*, 824 F.3d at 1110-11.

Indeed, Alford largely ignores the compelling reasons that the court gave for this within-Guidelines sentence: the horrors of January 6 that Alford helped support through his crimes; his failure, even after sitting through trial, to grasp the gravity of what he had done; his perverse insistence that the day's events were partially staged; his disingenuous

and false testimony; and, in the face of his denials and minimizations, the need to deter similar conduct by Alford or others in the future. Those explanations fully justified the sentence that the district court imposed. Having consciously joined a riot that threatened the foundation of our democracy, Alford deserved a significant sentence.

Rather than addressing why his conduct merited a lesser sentence, Alford's challenge focuses almost entirely on the sentences that other January 6 defendants have received, arguing that his sentence is longer than any other January 6 misdemeanant, creating an unwarranted disparity (Br. 35-49, 52-53). As this Court recently explained, however, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2023) (citation omitted). After all, the Guidelines aim "to secure nationwide consistency," *Gall*, 552 U.S. at 49, including by grouping similar crimes together, and identifying the sort of conduct meriting an adjustment. *See Rita v. United States*, 551 U.S. 338, 349 (2007).

By contrast, Alford's narrow focus on disparity in January 6 cases carries obvious shortcomings. Most notably, it is hard to assess disparity

56

when Alford is "not similarly situated" to the people he compares himself to (SA41-42). *See Gall*, 552 U.S. at 55 (approving district court's consideration of "need to avoid unwarranted *similarities* among other co-conspirators who were not similarly situated"). Alford was the rare January 6 misdemeanant who had not pleaded guilty, and the two other data points he invokes is too small a pool for meaningfully assessing "disparity." And he was the only one who had testified falsely at trial. As Alford himself acknowledged below, those are "meaningful distinctions" (SA20). Indeed, had Alford not testified falsely at trial and avoided the § 3C1.1 adjustment, his Guidelines-recommended sentence would have been 6-12 months of incarceration, in a zone allowing a sentence of probation with home detention, *see* U.S.S.G. ch. 5, pt. A—a sentencing range comparable to the many other January 6 misdemeanants that Alford cites (Br. 42-43).

Further, Alford's demand for the same sentence as other January 6 defendants who engaged in similar conduct *on that day* improperly elevates a single sentencing factor—"the need to avoid unwarranted sentence disparities among defendants . . . who have been found guilty of similar conduct" under § 3553(a)(6)—above all others. Section 3553(a)

lays out a variety of other factors that must also be considered, including the Guidelines range (§ 3553(a)(4)), the history and characteristics of the defendant (§ 3553(a)(1)), and the need for deterrence and just punishment (§ 3553(a)(2)). Moreover, fixating on his actions on January 6 alone ignores his full relevant "conduct" here and the many other reasons that Alford deserves a higher sentence, including statements before and after January 6, his false testimony, his lack of acceptance of responsibility, and his refusal to grasp the seriousness of his offense. Deciding how best to balance those sentencing considerations is a task for the district court imposing sentencing, not an appellate court. *See United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). The district court fully considered Alford's disparity arguments below, and reasonably concluded that on balance a 12-month sentence was appropriate.

Contrary to Alford's insinuations (Br. 48-52), the longer sentence that those distinctions yielded was not punishment for exercising his right to demand a trial. Rather, because Alford had gone to trial and had never accepted responsibility, he was convicted of all four charged misdemeanors (whereas many who pleaded guilty bargained for reduced

charges), and he received no downward adjustment under § 3E1.1. Those sentencing consequences are the inherent flipside of offering leniency to those who plead guilty: "That some defendants pled guilty while others did not provides a perfectly valid basis for a sentencing disparity, and such disparity imposed no impermissible burden on [the defendant's] jury-trial right." *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 208 (D.C. Cir. 2013) (citation omitted).

Even more obviously, the 2-point adjustment under § 3C1.1 for Alford's false testimony was not punishment for Alford's choice to testify (cf. Br. 50-52). Alford had a right to testify, but he had no right to testify *falsely*. Had Alford testified truthfully, no adjustment would have applied (see SA15). Punishment can and should be heightened when a defendant chooses to take the stand and offer false testimony under oath.

Finally, while Alford acknowledges that § 2A2.4 provides his offense level, and § 3C1.1 recommends an upward adjustment, he suggests that they were "calibrated to more serious" conduct (Br. 49-52). It is not clear how Alford divines those sections' "calibration." For example, the 18 U.S.C. § 111(a)(1) conviction he cites (Br. 50) as indictive of § 2A2.4's coverage includes misdemeanor resisting a federal officer;

that conviction is not obviously more serious than Alford's § 1752(a)(2) conviction for disorderly or disruptive conduct in an area restricted by the Secret Service. There is a reason that the Sentencing Commission—not the parties—decide (at least initially) which crimes and conduct are sufficiently comparable to be grouped together. In any event, the district court fully considered Alford's "relative lack of culpability" in his conduct, recognizing that he was not "breaking any glass, or stealing anything, or screaming anything" (SA35]). Likewise, the district court explained that while Alford's "materially false" and "disingenuous" testimony merited the § 3C1.1 adjustment, he would have faced an even "harsher sentence" had he told larger "deliberate falsehoods" (SA06-07; SA37-39).

Alford fails to establish that his within-Guidelines 12-month sentence was substantively unreasonable.

## CONCLUSION

WHEREFORE, the government respectfully submits that the judgment of the District Court should be affirmed.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

CHRISELLEN R. KOLB
ELIZABETH H. DANELLO
MICHAEL J. ROMANO
JAMES D. PETERSON
Assistant United States Attorneys

/s/

ERIC HANSFORD
D.C. Bar #1017785
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Eric.Hansford@usdoj.gov
(202) 252-6829

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I HEREBY CERTIFY pursuant to Fed. R. App. P. 32(g) that this brief contains 12,267 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1), and therefore complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). This brief has been prepared in 14-point Century Schoolbook, a proportionally spaced typeface.

/s/
_____
ERIC HANSFORD
Assistant United States Attorney

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have caused a copy of the foregoing Brief for Appellee to be served by electronic means, through the Court's CM/ECF system, upon counsel for appellant, Tobie J. Smith, Esq., Assistant Federal Public Defender, on this 29th day of June, 2023.

/s/
_____
ERIC HANSFORD
Assistant United States Attorney

# STATUTORY ADDENDUM

# INDEX

18 USC § 1752 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-1

40 USC § 5104. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .A-3

---

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part I. Crimes (Refs & Annos)
      Chapter 84. Presidential and Presidential Staff Assassination, Kidnapping and Assault

18 U.S.C.A. § 1752

§ 1752. Restricted building or grounds

Effective: October 5, 2018
Currentness

**(a)** Whoever--

**(1)** knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

**(2)** knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

**(3)** knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions, obstructs or impedes ingress or egress to or from any restricted building or grounds; or [1]

**(4)** knowingly engages in any act of physical violence against any person or property in any restricted building or grounds; [2]

**(5)** knowingly and willfully operates an unmanned aircraft system with the intent to knowingly and willfully direct or otherwise cause such unmanned aircraft system to enter or operate within or above a restricted building or grounds;

or attempts or conspires to do so, shall be punished as provided in subsection (b).

**(b)** The punishment for a violation of subsection (a) is--

**(1)** a fine under this title or imprisonment for not more than 10 years, or both, if--

**(A)** the person, during and in relation to the offense, uses or carries a deadly or dangerous weapon or firearm; or

**(B)** the offense results in significant bodily injury as defined by section 2118(e)(3); and

**(2)** a fine under this title or imprisonment for not more than one year, or both, in any other case.

---

A-1

USCA Case #23-3023      Document #2005752      Filed: 06/29/2023      Page 78 of 82

**(c)** In this section--

   **(1)** the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area--

      **(A)** of the White House or its grounds, or the Vice President's official residence or its grounds;

      **(B)** of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

      **(C)** of a building or grounds so restricted in conjunction with an event designated as a special event of national significance; and

   **(2)** the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

## CREDIT(S)

   (Added Pub.L. 91-644, Title V, § 18, Jan. 2, 1971, 84 Stat. 1891; amended Pub.L. 97-308, § 1, Oct. 14, 1982, 96 Stat. 1451; Pub.L. 98-587, § 3(b), Oct. 30, 1984, 98 Stat. 3112; Pub.L. 103-322, Title XXXIII, § 330016(1)(G), Sept. 13, 1994, 108 Stat. 2147; Pub.L. 109-177, Title VI, § 602(a), (b)(1), Mar. 9, 2006, 120 Stat. 252; Pub.L. 112-98, § 2, Mar. 8, 2012, 126 Stat. 263; Pub.L. 115-254, Div. B, Title III, § 381, Oct. 5, 2018, 132 Stat. 3320.)

## Footnotes

1        So in original. The word "or" probably should not appear.

2        So in original. Probably should be followed by "or".

18 U.S.C.A. § 1752, 18 USCA § 1752
Current through P.L.118-6. Some statute sections may be more current, see credits for details.

---

---

A-2

United States Code Annotated
   Title 40. Public Buildings, Property, and Works (Refs & Annos)
      Subtitle II. Public Buildings and Works
         Part B. United States Capitol
            Chapter 51. United States Capitol Buildings and Grounds

40 U.S.C.A. § 5104

Formerly cited as 40 USCA § 193c; 40 USCA § 193d; 40 USCA
§ 193e; 40 USCA § 193f; 40 USCA § 193g; 40 USCA § 193m

§ 5104. Unlawful activities

Currentness

**(a) Definitions.**--In this section--

   **(1) Act of physical violence.**--The term "act of physical violence" means any act involving--

      **(A)** an assault or other infliction or threat of infliction of death or bodily harm on an individual; or

      **(B)** damage to, or destruction of, real or personal property.

   **(2) Dangerous weapon.**--The term "dangerous weapon" includes--

      **(A)** all articles enumerated in section 14(a) of the Act of July 8, 1932 ( ch. 465, 47 Stat. 654); and

      **(B)** a device designed to expel or hurl a projectile capable of causing injury to individuals or property, a dagger, a dirk, a stiletto, and a knife having a blade over three inches in length.

   **(3) Explosives.**--The term "explosives" has the meaning given that term in section 841(d) of title 18.

   **(4) Firearm.**--The term "firearm" has the meaning given that term in section 921(3) [1] of title 18.

**(b) Obstruction of roads.**--A person may not occupy the roads in the United States Capitol Grounds in a manner that obstructs or hinders their proper use, or use the roads in the area of the Grounds, south of Constitution Avenue and B Street and north of Independence Avenue and B Street, to convey goods or merchandise, except to or from the United States Capitol on Federal Government service.

**(c) Sale of articles, display of signs, and solicitations.**--A person may not carry out any of the following activities in the Grounds:

A-3

**(1)** offer or expose any article for sale.

**(2)** display a sign, placard, or other form of advertisement.

**(3)** solicit fares, alms, subscriptions, or contributions.

**(d) Injuries to property.**--A person may not step or climb on, remove, or in any way injure any statue, seat, wall, fountain, or other erection or architectural feature, or any tree, shrub, plant, or turf, in the Grounds.

**(e) Capitol Grounds and Buildings security.**--

**(1) Firearms, dangerous weapons, explosives, or incendiary devices.**--An individual or group of individuals--

**(A)** except as authorized by regulations prescribed by the Capitol Police Board--

**(i)** may not carry on or have readily accessible to any individual on the Grounds or in any of the Capitol Buildings a firearm, a dangerous weapon, explosives, or an incendiary device;

**(ii)** may not discharge a firearm or explosives, use a dangerous weapon, or ignite an incendiary device, on the Grounds or in any of the Capitol Buildings; or

**(iii)** may not transport on the Grounds or in any of the Capitol Buildings explosives or an incendiary device; or

**(B)** may not knowingly, with force and violence, enter or remain on the floor of either House of Congress.

**(2) Violent entry and disorderly conduct.**--An individual or group of individuals may not willfully and knowingly--

**(A)** enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House;

**(B)** enter or remain in the gallery of either House of Congress in violation of rules governing admission to the gallery adopted by that House or pursuant to an authorization given by that House;

**(C)** with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of--

A-4

**(i)** either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress; or

**(ii)** the Library of Congress;

**(D)** utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress;

**(E)** obstruct, or impede passage through or within, the Grounds or any of the Capitol Buildings;

**(F)** engage in an act of physical violence in the Grounds or any of the Capitol Buildings; or

**(G)** parade, demonstrate, or picket in any of the Capitol Buildings.

**(3) Exemption of government officials.**--This subsection does not prohibit any act performed in the lawful discharge of official duties by--

**(A)** a Member of Congress;

**(B)** an employee of a Member of Congress;

**(C)** an officer or employee of Congress or a committee of Congress; or

**(D)** an officer or employee of either House of Congress or a committee of that House.

**(f) Parades, assemblages, and display of flags.**--Except as provided in section 5106 of this title, a person may not--

**(1)** parade, stand, or move in processions or assemblages in the Grounds; or

**(2)** display in the Grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization, or movement.

### CREDIT(S)

(Pub.L. 107-217, § 1, Aug. 21, 2002, 116 Stat. 1176; Pub.L. 110-161, Div. H, Title I, § 1004(d)(2)(A)(iii), Dec. 26, 2007, 121 Stat. 2234; Pub.L. 110-178, § 4(b)(1)(C), Jan. 7, 2008, 121 Stat. 2552; Pub.L. 111-145, § 6(d)(1), Mar. 4, 2010, 124 Stat. 54.)

**Footnotes**

1    So in original. Probably should be "921(a)(3)".

40 U.S.C.A. § 5104, 40 USCA § 5104
Current through P.L.118-6. Some statute sections may be more current, see credits for details.

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.